Davida **JOHNSON**; Pam Burke; Henry Zittrouer; George L. Deloach; and George Seaton, Plaintiffs,

v.

Zell **MILLER**, in his Official Capacity as Governor of the State of Georgia; Pierre Howard, in his Official Capacity as Lieutenant Governor of the State of Georgia and President of the Georgia Senate; Thomas Murphy, in his Official Capacity as Speaker of the Georgia House of Representatives and Max Cleland, in his Official Capacity as Secretary of State of the State of Georgia, Defendants,

and

Lucious Abrams, Jr.; Rev. G.L. Avery; William Gary Chambers, Sr.; Judy Lambers; Rita Valenti; and Karen Watson, Intervenor Defendants,

and

United States of America, Intervenor Defendant.

No. CV 194–008.

United States District Court, S.D. Georgia, Augusta Division.

Dec. 1, 1995.

---

See also 864 F.Supp. 1354, redrawing congressional districting plan.

A. Rowland Dye, Dye, Tucker, Everitt, Wheale & Long, Augusta, GA, Larry H. Chesin, A. Lee Parks, Kirwan, Goger, Chesin & Parks, Atlanta, GA, for plaintiffs.

Dennis Robert Dunn, Atlanta, GA, David Frank Walbert, Walbert & Mathis, Atlanta, GA, for Zell Miller, Pierre Howard, Max Cleland, Lewis Massey.

Sam George Nicholson, Augusta, GA, Sewell R. Brumby, Office of Legislative Counsel, Atlanta, GA, for Thomas Murphy.

Laughlin McDonald, Neil Bradley, Mary Ellen Wyckoff, ACLU, Atlanta, GA, for Lucious Abrams, Jr., Rev. G.L. Avery, William Gary Chambers, Sr., and Karen Watson.

Judybeth Greene, Loretta King, Daniel H. Clayman, Dept. of Justice—Civil Rights Div., Washington, DC, Donna M. Murphy, Dept. of Justice, Civil Rights Division, Voting Section, Washington, DC, for U.S.

Doug Teper, Atlanta, GA, pro se.

A. Leon Higginbotham, Jr., New York City, for amicus curiae Congressional Black Caucus.

Frank B. Strickland, Anne Ware Lewis, Wilson, Strickland & Benson, Atlanta, GA, Richard Scott Thompson, McNatt, Greene & Thompson, Vidalia, GA, Dalton L. Oldham, Columbia, SC, for John Lewis and Newt Gingrich.

Sanford D. Bishop, Jr., Washington, DC, pro se.

Jim Coonan, Atlanta, GA, pro se.

Woodrow Lovett, Sardis, GA, pro se.

Gray Brumby, Atlanta, GA, pro se.

Before EDMONDSON, Circuit Judge; EDENFIELD, Chief District Judge; and BOWEN, District Judge.

## ORDER

In this expedited matter, the question presented is this one: Is Georgia's Second Congressional District unconstitutional on the ground that it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution? The answer is "Yes."

After a trial on the merits and in the light of *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), we find and conclude that race, namely the intention to create a congressional district in which black persons would be a majority of the voting age population, was the overriding and predominant factor motivating the placement of the Second District's boundaries.[1] We find

---

1. Some of the parties contended that no trial was necessary. The Department of Justice contended that, as a matter of law, the Second District was unconstitutional considering this court's earlier judgment and the Supreme Court's affirmance of that judgment. Plaintiffs contended that the pre- trial record in this case entitled them to summary judgment as a matter of law. Out of an abundance of caution and given the need to move forward as conveniently and speedily as the court could, a trial was held; and the legal issues raised by the Department of Justice and

that the boundary line for the district was consistently drawn to keep potential black voters in the district and to keep potential white voters out of the district. The district was drawn to segregate voters according to their race; so, it is an unlawful district.

## Findings of Fact

The facts stipulated to by all of the parties are accepted and found by the court. The court also stands by the findings of fact in its earlier decision on Georgia's Eleventh District, *Johnson v. Miller*, 864 F.Supp. 1354 (S.D.Ga.1994);[2] those findings are pertinent to the Second District as well.

The first congressional redistricting plan submitted by Georgia to the United States Attorney General for preclearance in October 1991 contained a Second Congressional District, located in southwestern Georgia, in which blacks comprised 35.37% of the voting age population ("VAP"). The Department of Justice ("DOJ") refused preclearance of this plan. A new plan was enacted and submitted for preclearance in which the black VAP in the Second Congressional District was 45.01%. The DOJ again refused preclearance, relying on alternative plans proposing three majority-minority districts.

The critical element to making the Second Congressional District a majority-minority district was the "Macon/Savannah trade" which transferred black voters from Macon—located in the Eleventh Congressional District in the first two state plans submitted to the DOJ—to the Second Congressional District and then extending the Eleventh District into Savannah. This move converted the Second Congressional District into a majority-minority district and kept the Eleventh Congressional District a majority-minority district by offsetting the loss of black voters in Macon with the addition of black voters in Savannah. This third plan was precleared by the DOJ. As enacted, the Second Congressional District had a 52.33% black VAP.

Twelve of the Second Congressional District's thirty-five counties are split, and to draw the Second Congressional District as it is now also required the splitting of twenty-eight precincts.[3] In addition, the boundary of the Second District splits the cities of Columbus, Macon, Albany, Manchester, Roberta, Byron, Centerville, Warner Robins, Ft. Valley, Perry, Cordele, Leesburg, Moultrie, and Valdosta. Before 1992, the Second District included no portions of the City of Columbus or portions of the City of Macon. Before 1992, the Second Congressional District contained no split counties.

We find that the sole reason for splitting precincts was racial and that the predominant reason for splitting the counties and cities was racial as well.

Georgia's Second District makes use of narrow land bridges to connect parts of the district and involves a number of irregular appendages. These features affect the district's compactness adversely and, in some instances, make parts of the district only barely contiguous. We find that the predominant reason for these irregular lines is race; most can be explained on no other basis.

Linda Meggers, Director of Reapportionment Services for the Georgia General Assembly, was qualified as an expert witness. She testified that it was not feasible to create a majority-minority district in the Second Congressional District without including the black population centers in Columbus and

the Plaintiffs on the question of whether a trial was needed were bypassed.

2. The record of the trial on the Eleventh District was made part of the record for the trial on the Second. At the trial of the Second District, many witnesses testified either in person or by deposition; and many documents were introduced. All the evidence has been considered, although not all of it will be specifically mentioned in this opinion.

3. By the way, one bad side effect of the splitting of units as small as precincts for racial purposes occurs when the precinct is divided in one way for a state house seat, another way for a state senate seat, and yet a different way for a congressional seat. When this kind of gerrymandering is repeated often enough, the voting combinations that appear on some ballots are so rare—at the intersection of the state house, state senate, and congressional district lines within a precinct—that a secret ballot becomes difficult for some voters. Given the small number of ballots showing the specific combination of candidates, the persons later counting the few ballots of that kind actually cast might well know which ballot a particular voter cast.

Muscogee County, Albany and Dougherty County, and Macon and Bibb County. She further testified that, in drawing the Second Congressional District, she—we find her to have been the chief draftsperson for the district—followed the "Max–Black Plan," as espoused by the ACLU, to the same degree to which she followed it in drawing the Eleventh Congressional District. The Max–Black Plan's purpose was to maximize black voting strength in certain congressional districts by making the racial composition of those districts the overriding consideration in their design. She also said that, in terms of socio-economic interests included in the district, the Second District is one of the most diverse in Georgia. We credit Ms. Meggers' testimony.

A comparison of maps depicting the Second District's twelve split counties with maps showing the concentration of black residents in the same counties proves that the drawing of Georgia's Second Congressional District was motivated predominately by racial considerations.[4] Put differently, the line was drawn to put black voters in the Second District and to keep white voters out.

Dr. Timothy O'Rourke, Professor of Citizenship Education at the University of Missouri–St. Louis, was qualified as an expert witness. Dr. O'Rourke testified that he had been asked to examine the boundaries of the Second Congressional District in the light of the standard announced by the Supreme Court in *Miller v. Johnson* and to form an opinion about whether the Georgia Legislature had, in fact, subordinated its traditional redistricting principles to race for the Second District. He further testified that he had taken into account such matters as the one-person/one-vote standard, respect for political subdivision boundaries, compactness, contiguity, the extent to which the district includes metropolitan areas, the extent to

which the district includes media markets, and socio-economic communities of interest in the region. By following a process of elimination which he explained, Dr. O'Rourke concluded that the predominant motivating factor for the configuration of the Second District was race. We credit Dr. O'Rourke's testimony.

We find that Georgia did discriminate against its black citizens in voting matters in the past.

We find no evidence that Georgia's General Assembly at the time the Second Congressional District was drawn was, in reality, seeking to eliminate the effects of past racial discrimination on black voting patterns in southwest Georgia.

We find that the General Assembly's intent at the time the Second Congressional District was drawn was to comply with the Justice Department's interpretation of the Voting Rights Act and the Department's preclearance demands.

### Conclusions of Law

In defense, the State defendants ("State") stress only that the Second District differs from the unconstitutional Eleventh Congressional District because (1) the Second District has always existed in the southwestern corner of the State, (2) there is a greater community of interest in the Second District, and (3) the Second District, compared to the Eleventh District, has a lower percentage of black voters. While it is true that the Second District does differ in some respects from the Eleventh, the differences are not significant enough to make the Second District constitutional.

Nothing in the State's argument changes the fact that the General Assembly was predominantly motivated by race in its drawing

---

4. The portions of Bibb County placed in the Second District reflect the heavy concentration of black residents in that portion of Bibb County. Pltf.Exh. 1, 13 (Joint Exh. 2, Pltf.Exh. 32). The portions of Colquitt County placed in the Second District reflect the heavy concentration of black residents in that portion of Colquitt County. Pltf. Exh. 2, 14 (Joint Exh. 9, Pltf.Exh. 38). The portions of Crisp County placed in the Second District reflect the heavy concentration of black

residents in that portion of Crisp County. Pltf. Exh. 3, 15 (Joint Exh. 8, Pltf.Exh. 37). The same can be said for the remaining nine counties that are split in the Second Congressional District. Pltf.Exh. 4–12, 16–23 (Joint Exh. 3–7 and 10–13, Pltf.Exh. 33–36 and 39–42).

To alleviate confusion, we cite to both sets of exhibits—those submitted as part of Plaintiffs' motion for summary judgment and those used at trial.

of the Second Congressional District. The sections of the district's boundary that were drawn for racial reasons are substantial in terms of both distance and population affected. The voters within the Second District may possibly have a greater community of interest than those in the Eleventh District, but it is clear the General Assembly did not draw many of the lines of the Second District because of that community of interest. Looking at the split counties and precincts, white voters left out of the district because they were white shared the same interests (for example, agriculture or military employment) as black voters who were included because they were black. That fewer black voters were purposely placed into the Second District than into the Eleventh does not change the fact that the General Assembly intentionally placed black voters into the Second and kept white voters out of the Second solely because of their race.

Because race was the overriding and predominant motivating factor in designing the Second Congressional District, the district can be upheld only if it survives strict scrutiny. *Miller,* —— U.S. at ——, 115 S.Ct. at 2490.

The State fails to meet its burden under the strict scrutiny analysis. The State never argued that the Second District was required by the Voting Rights Act.[5] We accept that eradicating the effects of past racial discrimination can be a significant state interest. *See Shaw v. Reno,* 509 U.S. 630, ——, 113 S.Ct. 2816, 2831, 125 L.Ed.2d 511 (1993). But, the State has not argued persuasively that the present Second Congressional District was configured to eradicate the effects of past racial discrimination, as opposed to and apart from complying with federal statutes. *See generally Miller,* —— U.S. at ——, 115 S.Ct. at 2490 (not every state action to comply with DOJ's view of Voting Rights Act is, in itself, step by state to eradicate effect of past racial discrimination for purposes of strict scrutiny). No evidence exists in the record that the General Assembly at the time the Second District was drawn was seeking,

in reality, to eliminate the effects of past racial discrimination on black voting patterns in southwest Georgia. *Cf. City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 488–493, 109 S.Ct. 706, 719–721, 102 L.Ed.2d 854 (1989) (discussing need for government to demonstrate specific need and justification for favoring racial group).

We conclude and declare that Georgia's Second Congressional District is unconstitutional in its current composition. Defendants are hereby barred from using it in future Congressional elections.

IT IS SO ORDERED.

> FOR THE THREE–JUDGE COURT:
>
> /s/ J.L. EDMONDSON
> UNITED STATES CIRCUIT JUDGE

---

5. The Supreme Court has said that the Second District—the third and last majority-minority district to be created for Georgia—was not required for Section 5 preclearance and that compliance

with a mistaken reading of the Voting Rights Act cannot justify race-based districting. *Miller,* —— U.S. at —— ——, 115 S.Ct. at 2491–92.