## ABRAMS ET AL. *v.* JOHNSON ET AL.

No. 95–1425.   Argued December 9, 1996—Decided June 19, 1997*

---

*Together with No. 95–1460, *United States* v. *Johnson et al.*, also on appeal from the same court.

Kennedy, J., delivered the opinion of the Court, in which Rehnquist, C. J., and O'Connor, Scalia, and Thomas, JJ., joined. Breyer, J., filed

a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 103.

*Deputy Solicitor General Waxman* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Dellinger, Assistant Attorney General Patrick, Deputy Solicitor General Bender, James A. Feldman, Steven H. Rosenbaum,* and *Miriam R. Eisenstein. Laughlin McDonald* argued the cause for appellants Abrams et al. With him on the briefs were *Neil Bradley, Mary Wyckoff, Elaine R. Jones, Norman J. Chachkin, Jacqueline Berrien,* and *Gerald R. Weber.*

*Michael J. Bowers,* Attorney General of Georgia, argued the cause for appellees Miller et al. With him on the brief were *Dennis R. Dunn,* Senior Assistant Attorney General, and *David F. Walbert,* Special Assistant Attorney General. *A. Lee Parks* argued the cause and filed a brief for appellees Johnson et al.†

JUSTICE KENNEDY delivered the opinion of the Court.

The electoral district lines for Georgia's congressional delegation are before us a second time, appeal now being taken from the trial court's rulings and determinations after our remand in *Miller* v. *Johnson,* 515 U. S. 900 (1995). The three-judge panel of the United States District Court for the Southern District of Georgia was affirmed in *Miller* after it found the Eleventh Congressional District unconstitutional as then drawn. Race, we held, must not be a predominant factor in drawing the district lines. *Id.,* at 915–917.

Given the contorted shape of the district and the undue predominance of race in drawing its lines, it was unlikely the district could be redrawn without changing most or all of Georgia's congressional districts, 11 in total number. The

---

†*J. Gerald Hebert* filed a brief for the Georgia Association of Black Elected Officials as *amicus curiae* urging reversal.

*Sharon L. Browne* and *Deborah J. La Fetra* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging affirmance.

plan being challenged contained three majority-black districts, and after our remand the complaint was amended to challenge another of these, the then-Second District. The trial court found this district, too, was improperly drawn under the standards we confirmed in *Miller*. *Johnson* v. *Miller*, 922 F. Supp. 1552 (1995).

For the task of drawing a new plan, the court deferred to Georgia's Legislature, but the legislature could not reach agreement. The court then drew its own plan, *Johnson* v. *Miller*, 922 F. Supp. 1556 (1995); we declined to stay the order; and the 1996 general elections were held under it. The court's plan contained but one majority-black district. The absence of a second, if not a third, majority-black district has become the principal point of contention. Though the elections have been completed, the plan remains in effect until changed by a valid legislative Act, and the appellants ask us to set it aside.

The private appellants are various voters, defendant-intervenors below, who contend that the interests of Georgia's black population were not adequately taken into account. The United States, also a defendant-intervenor, joins in the appeal. The state officials, defendants below, do not object to the plan and appeared before us as appellees to defend it. The other set of appellees are the private plaintiffs below, who argued that racial gerrymandering under the previous plan violated their right to equal protection.

The private appellants attack the court's plan on five grounds. First, citing *Upham* v. *Seamon*, 456 U. S. 37 (1982) *(per curiam)*, they say the District Court erred in disregarding the State's legislative policy choices and in making more changes than necessary to cure constitutional defects in the previous plan. Second and third, they allege the plan violates §§ 2 and 5 of the Voting Rights Act of 1965, 42 U. S. C. §§ 1973, 1973c. Fourth, they argue the court's plan contains significant population deviations and so violates the constitutional one-person, one-vote requirement. Fifth, they claim

the District Court erred in not allowing private intervention on the question of the Second District's unconstitutionality. The Justice Department included questions one, two, and four in its jurisdictional statement. Private appellants did not brief their fifth contention, and we will not address it. The remaining challenges are unavailing as well, and we affirm the judgment of the District Court.

## I

We first address appellants' argument that the court exceeded the remedial power authorized by our decisions, particularly *Upham* v. *Seamon, supra,* by failing to follow policies of the state legislature. When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act. 456 U. S., at 43. Much of the argument from the parties centers around what legislative redistricting principles the District Court should have acknowledged in drawing its plan. The appellants say the relevant redistricting guideline should be the three majority-black districts of the precleared plan at issue in *Miller* v. *Johnson;* and, if not, the two majority-black districts in an earlier legislative effort. These contentions require us to recite some of the background against which the Georgia Legislature—and later the trial court—attempted to draw the districts.

## A

Much of the history is recounted in *Miller* v. *Johnson,* and we repeat only some of it here. The need for redistricting arose in 1990 when Georgia, because of its population increase, went from 10 authorized congressional seats to 11. To move ahead with redistricting, a special session of the legislature opened in August 1991. Because Georgia is a covered jurisdiction under § 4(b) of the Voting Rights Act, 42

U. S. C. § 1973b(b), § 5 of the Act requires it to obtain either administrative preclearance by the Attorney General or approval by the United States District Court for the District of Columbia for any change in a "standard, practice, or procedure with respect to voting." 42 U. S. C. § 1973c. The proposed change must not have the purpose or effect "of denying or abridging the right to vote on account of race or color." *Ibid.* The legislature submitted a plan to the Attorney General for preclearance on October 1, 1991. See Appendix to this opinion (hereinafter Appendix), fig. 1. The plan contained two majority-black districts, the Fifth and the Eleventh. Previously, Georgia had one majority-black district, the Fifth.

The Department of Justice refused preclearance of this plan in January 1992. It then refused preclearance of a second plan submitted by the legislature, also with two majority-black districts. In its second refusal, the Department of Justice cited several alternative plans proposing three majority-black districts, including one called the "max-black" plan, drafted by the American Civil Liberties Union (ACLU) for the General Assembly's black caucus. At that point, the General Assembly set out to create three majority-black districts to gain preclearance. See Appendix, fig. 2. The plan as adopted used the ACLU's max-black plan as a model. One of the three majority-black districts, the Eleventh, was a geographic "'monstrosity, stretching from Atlanta to Savannah. Its core is the plantation country in the center of the state, lightly populated, but heavily black. It links by narrow corridors the black neighborhoods in Augusta, Savannah and southern DeKalb County.'" 515 U. S., at 909 (quoting M. Barone & G. Ujifusa, Almanac of American Politics 356 (1994)). The district as so drawn served its purpose, however, which was to secure preclearance from the Department of Justice.

On November 4, 1992, elections were held under the new plan, and all three majority-black districts elected black can-

didates. In 1994, five white voters from the Eleventh District filed suit in the United States District Court for the Southern District of Georgia, alleging a racial gerrymander in the lines of the Eleventh District, in violation of the Equal Protection Clause as interpreted in *Shaw* v. *Reno*, 509 U. S. 630 (1993). The District Court panel found the district invalid, with one judge dissenting. *Johnson* v. *Miller*, 864 F. Supp. 1354 (1994).

We affirmed. *Miller* v. *Johnson*, 515 U. S. 900 (1995). We rejected appellants' argument that "regardless of the legislature's purposes, a plaintiff must demonstrate that a district's shape is so bizarre that it is unexplainable other than on the basis of race." *Id.*, at 910. We said "the essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts." *Id.*, at 911. And we explained that "[t]he plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.*, at 916.

We upheld two principal findings of the District Court indicating race was the predominant factor in constructing the Eleventh District. First, it was "'exceedingly obvious'" from the district's contorted shape, together with the relevant racial demographics, that it was designed to bring in black populations. *Id.*, at 917 (quoting 864 F. Supp., at 1375). Second, considerable evidence—including the State's own concessions—showed that the General Assembly was driven by "a predominant, overriding desire" to create three majority-black districts to satisfy the Department of Justice. 515 U. S., at 917. The Justice Department, indeed, "'would accept nothing less than abject surrender to its maximization agenda.'" *Ibid.* (quoting 864 F. Supp., at 1366, n. 11).

We then considered whether the race-based districting satisfied strict scrutiny because it was narrowly tailored to achieve a compelling governmental interest. As we noted, "[o]ur presumptive skepticism of all racial classifications" prohibited us "from accepting on its face the Justice Department's conclusion that racial districting is necessary under the Voting Rights Act." 515 U. S., at 922. After reviewing the evidence, we concluded that "[i]nstead of grounding its objections on evidence of a discriminatory purpose, it would appear the Government was driven by its policy of maximizing majority-black districts." *Id.*, at 924.

On remand, the District Court deferred to the Georgia Legislature, giving it time to draw a new congressional map. The Governor called a special session of the General Assembly, which met from August 14 to September 12, 1995. The legislature, however, deadlocked on the congressional reapportionment plan. The Georgia House of Representatives adopted a plan with two majority-black districts, Status Report of Defendants Miller, Howard, and Cleland, Aug. 31, 1995, Record, Pleadings Vol. 11, Doc. No. 295, while the Senate adopted a plan with one, Status Report of Defendants Miller, Howard, and Cleland, Sept. 5, 1995, *id.*, Doc. No. 300. On September 13, 1995, defendants notified the District Court that the legislature was unable to resolve its differences and had adjourned, leaving the District Court to develop a remedy.

Plaintiffs had moved to amend their complaint to challenge the Second District as unconstitutional on the same grounds as the Eleventh District, and the court received additional evidence for the purpose. None of the private defendant-intervenors lived in the Second District and, assuming their lack of standing to defend it, they asked for the addition of other parties. The court disallowed the request, ruling the State could defend this aspect of the plan under review.

The court found that race was the "overriding and predominant factor" in drawing the Second District's borders. 922

F. Supp., at 1553. The district, the court noted, split 12 of the district's 35 counties, 28 of its precincts, and numerous cities. Linda Meggers, Director of Reapportionment Services for the Georgia General Assembly, was qualified as an expert witness and testified it was not possible to create a majority-black Second District without including the black population centers in Columbus and Muscogee Counties, Albany and Dougherty Counties, and Macon and Bibb Counties, which account for most of these splits. She also testified that in constructing the Second District, she followed the ACLU's max-black plan. *Id.,* at 1554–1555. As with the Eleventh District, the trial court found no compelling reason for the race-based districting of the Second District sufficient to survive strict scrutiny. The appellants do not appeal the determination by the trial court that the Second District as drawn could not survive scrutiny under the standards set forth in *Miller,* but they do say the trial court erred in not devising a second majority-black district for its own plan.

During the remedy phase, the defendants proposed a variety of plans. One was the 1991 unprecleared plan passed by the Georgia Legislature, with two majority-black districts. The Eleventh District in the 1991 plan closely resembled the Eleventh District in the precleared plan, which has been found improper. The ACLU submitted four plans. One of these, ACLU 1A, with two majority-black districts, was known as the "least change" plan because it was designed to make the minimal changes perceived to be necessary to correct constitutional defects in the existing plan. Another of the ACLU plans, Abrams A, had three majority-black districts. Abrams A split nine counties in the Second District and three in the Eleventh, and for racial reasons. Yet another plan, Abrams C, had two majority-black districts. And a plan jointly sponsored by John Lewis, a black Democratic Member of the United States House of Representatives from Georgia, and Newt Gingrich, a white Republican

Member—the Lewis-Gingrich Amici-R plan—contained two majority-black districts. In response, it is said, to a submission by plaintiffs, the Justice Department submitted its "Illustrative Plan." The Justice Department did not do so, however, until after the evidence closed. The plan contained two majority-black districts and split two counties outside the Atlanta area and numerous precincts. The plaintiffs objected to the submission. The District Court mentioned the Illustrative Plan in its opinion but did not give an explicit ruling on the objection. The late submission prevented the Justice Department's demographer from being cross-examined about racial motivations, and for this reason its significance must be discounted.

The District Court considered the plans submitted by the various parties and then adopted its own. See Appendix, fig. 3. Noting the Justice Department's thorough "subversion of the redistricting process" since the 1990 census, it based its plan on the State's 1972 and 1982 plans. 922 F. Supp., at 1563. The court first had to decide where to locate the new Eleventh District, and did so in an area of significant population growth near Atlanta, so as to displace the fewest counties. It then considered Georgia's traditional redistricting principles based on maintaining: district cores, four traditional "corner districts" in the corners of the State, political subdivisions such as counties and cities, and an urban majority-black district in the Atlanta area. Protecting incumbents from contests with each other was another factor, which the court subordinated to the others because it was "inherently more political." *Id.*, at 1565. The District Court stated that, in fashioning a remedy, it considered the possibility of creating a second majority-black district but decided doing so would require it to "subordinate Georgia's traditional districting policies and consider race predominantly, to the exclusion of both constitutional norms and common sense." *Id.*, at 1566. Georgia did not have a black population of sufficient concentration to allow creation

of a second majority-black district, the court found, adding that if it had the court "would have included one since Georgia's legislature probably would have done so." *Id.*, at 1567, n. 16. The resulting plan contained one majority-black district, the Fifth. The plan split no counties outside the Atlanta area. The District Court rejected potential objections to the plan based on §§ 2 and 5 of the Voting Rights Act and the constitutional requirement of one person, one vote.

## B

Given this background, appellants say, the District Court's plan violates our direction in *Upham* v. *Seamon* to take account of legislative preferences. In *Upham*, the District Court considered a reapportionment plan passed by the Texas Legislature. The Attorney General had objected under § 5 of the Voting Rights Act to a specific part of the plan, namely, the lines drawn for two contiguous districts in south Texas. He had approved the other 25 districts. The trial court, required to draw new lines, redrew not just the two districts found objectionable and their neighbors but also some unrelated districts in Dallas County, hundreds of miles to the north. 456 U. S., at 38. In the absence of a finding that the legislature's reapportionment plan offended either the Constitution or the Voting Rights Act, we held, the District Court "was not free . . . to disregard the political program" of the state legislature. *Id.*, at 43. See also *White* v. *Weiser*, 412 U. S. 783, 797 (1973).

The instant action presents a quite different situation from *Upham*, and for several reasons. In the first place, the precleared plan is not owed *Upham* deference to the extent the plan subordinated traditional districting principles to racial considerations. *Upham* called on courts to correct—not follow—constitutional defects in districting plans. 456 U. S., at 43. In *Miller*, we found that when the Georgia Legislature yielded to the Justice Department's threats, it also adopted the Justice Department's entirely race-focused ap-

proach to redistricting—the max-black policy. 515 U. S., at 917–918. Using the precleared plan as the basis for a remedy would validate the very maneuvers that were a major cause of the unconstitutional districting.

Second, the constitutional violation here affects a large geographic area of the State; any remedy of necessity must affect almost every district. In *Upham*, only 2 contiguous districts out of 27 were in violation. Here, as the District Court pointed out, 2 of 11 districts were found unconstitutional, on opposite sides of the State, districts containing between them all or parts of nearly a third of Georgia's counties. 922 F. Supp., at 1561. Almost every major population center in Georgia was split along racial lines. Under the circumstances, the District Court was justified in making substantial changes to the existing plan consistent with Georgia's traditional districting principles, and considering race as a factor but not allowing it to predominate. This approach conforms to the rule explained in *Upham*.

Appellants' most specific objection under *Upham* is that the court's plan does not contain two majority-black districts. In particular, they point to the State's original 1991 redistricting plan, denied preclearance, which contained two majority-black districts. As we have suggested above, however, the State was subjected to steady Justice Department pressure to create the maximum number of majority-black districts, and there is considerable evidence the State was predominantly driven by this consideration even in developing its 1991 plan. In support of their position, appellants rely on broad assertions in the State's brief in this Court in *Johnson* v. *Miller* that the original plan "was not perceived as a 'racial gerrymander.'" Brief for Miller Appellants in *Miller* v. *Johnson*, O. T. 1994, No. 94–631, p. 49. Against these assertions, appellees point to the testimony of Ms. Meggers, Director of Reapportionment Services for the Georgia General Assembly, that the second majority-black district was originally designed as a concession to the Justice

Department's max-black policy. After being presented with a proposed map of the Eleventh District, "[t]he initial response in our office was that's ridiculous." "It was said that it doesn't make any sense and I said maybe not, but . . . we may get in trouble with the Justice Department if we don't draw [it] . . . like that and I think that was . . . the main reason" it was originally drawn. Tr. 431–432 (Oct. 30, 1995). Ms. Meggers referred to an "understanding" between the leadership in the legislature and the black caucus that a second majority-black district would be created. *Id.*, at 431. The testimony of several legislators indicated that any such understanding was arrived at in the shadow of the Justice Department's max-black goal, and that all other policies were to give way to this racial consideration. Robert Hanner, chairman of the House Reapportionment Committee, so indicated in his testimony. *Id.*, at 74–75. Sonny Dixon, a member of the House Reapportionment Committee, confirmed this account and said legislators felt pressure from the Justice Department in 1990 to create all possible majority-black districts. *Id.*, at 81. Thomas Murphy, Speaker of the Georgia House of Representatives in 1990 and now, said in his deposition that the initial 1991 reapportionment plan was based on "what we at least perceived to be the direction and instructions of the Justice Department." Deposition of Thomas B. Murphy, Record 22–23; see also *id.*, at 4, 6. This evidence all refers to development of the original 1991 legislative plan, not the 1992 precleared plan, and thus undermines the contention that the legislature's original plan should have been controlling on the District Court.

There is strong support, then, for finding the second majority-black district in Georgia's 1991 unprecleared plan resulted in substantial part from the Justice Department's policy of creating the maximum number of majority-black districts. It is not Justice Department interference *per se* that is the concern, but rather the fact that Justice Department pressure led the State to act based on an overriding

concern with race. Given this background, it would have been most problematic for the trial court to insist on retaining a second majority-black district without regard to other, neutral districting factors. The trial court did not adopt this course. Instead, it gave careful consideration to creation of a second black district on grounds that a black voting population was one factor in drawing a district; and it concluded it could not draw the second majority-black district without allowing that one consideration to predominate over other traditional and neutral districting principles, principles which were a valid expression of legislative policy. There is ample basis in the record to support these conclusions. No other plan demonstrated a second majority-black district could be drawn while satisfying the constitutional requirement that race not predominate over traditional districting principles. The District Court said in its opinion that "[i]f Georgia had a concentrated minority population large enough to create a second majority-minority district without subverting traditional districting principles, the Court would have included one since Georgia's legislature probably would have done so." 922 F. Supp., at 1567, n. 16. The statements of several witnesses support the trial court's independent conclusion it was not possible to do so. Ms. Meggers testified that, unless race was the predominant motive, a second majority-black district could not be drawn in Georgia. Tr. 434–435 (Oct. 30, 1995). Speaker Murphy doubted "very seriously" a second majority-black district could be drawn in Georgia without violating the principles we laid down in *Miller.* Deposition, Oct. 26, 1995, Record 24.

The court found the 1991 unprecleared plan shared many of the constitutional defects of the precleared plan. Among other things, it connected the south DeKalb County urban black population with the mainly rural east Georgian minority population. 922 F. Supp., at 1563, n. 9. Indeed, the Eleventh District in the 1991 plan in many respects was almost the geographical monstrosity it became in the pre-

cleared plan. The ACLU plans were introduced at the remedial hearing by Selwyn Carter, an employee of the Atlanta-based private Southern Regional Council whose job was to draw and advocate reapportionment plans across the South. Mr. Carter said his "basic goal" in preparing the plans was "[t]o show that it is possible to draw a plan in which African American voters comprise approximately 50 percent of the voting age population of a district and at the same time show that race was not a factor." Tr. 296 (Oct. 30, 1995). The "least-change" plan, ACLU 1A, has numerous flaws. Besides its high population deviation, to be discussed, the Eleventh District has an iguana-like shape betraying the same invidious purpose we condemned in *Miller*. The only two plans close to the trial court's in terms of population deviation are Abrams A and the Justice Department's Illustrative Plan. Abrams A, with its three majority-black districts, splits nine counties in the Second District and three in the Eleventh, as well as numerous other counties in different parts of the State. The twisted shapes of its Second and Eleventh Districts again bear witness to racial motivation. The Illustrative Plan splits Bibb County—a county never before split in apportionment plans—to subsume Macon's black population. Although the Justice Department submitted the plan after the close of evidence, and in consequence its demographer could not be cross-examined on the question of racial motivation, the District Court recognized its apparent racial impetus. 922 F. Supp., at 1561, n. 4. Indeed, the Justice Department acknowledged a racial motivation at oral argument before the Court. Tr. of Oral Arg. 12, 16. The Justice Department also suggested it was proper to split Bibb County because the mayor and city council of Macon supported splitting the county and city into different districts. *Id.*, at 13. Macon's alleged urge to be segregated for congressional districting purposes, however, cannot vitiate the equal protection rights of the Eleventh District's objecting voters.

Interference by the Justice Department, leading the state legislature to act based on an overriding concern with race, disturbed any sound basis to defer to the 1991 unprecleared plan; the unconstitutional predominance of race in the provenance of the Second and Eleventh Districts of the 1992 precleared plan caused them to be improper departure points; and the proposals for either two or three majority-black districts in plans urged upon the trial court in the remedy phase were flawed by evidence of predominant racial motive in their design. In these circumstances, the trial court acted well within its discretion in deciding it could not draw two majority-black districts without itself engaging in racial gerrymandering.

## II

The court-ordered plan is not violative of § 2 of the Voting Rights Act. We reject appellants' contrary position, which is premised on impermissible vote dilution in the court's failure to create a second majority-black district. Section 2 of the Voting Rights Act applies to any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . imposed or applied by any State or political subdivision . . . ." 42 U. S. C. § 1973(a). On its face, § 2 does not apply to a court-ordered remedial redistricting plan, but we will assume courts should comply with the section when exercising their equitable powers to redistrict. A violation of § 2 occurs if "it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial minority] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b).

Our decision in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986), set out the basic framework for establishing a vote dilution claim against at-large, multimember districts; we have since extended the framework to single-member districts. *Growe*

v. *Emison*, 507 U. S. 25, 40–41 (1993).   Plaintiffs must show three threshold conditions: first, the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district"; second, the minority group is "politically cohesive"; and third, the majority "votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate."   478 U. S., at 50–51.   Once plaintiffs establish these conditions, the court considers whether, "on the totality of circumstances," minorities have been denied an "equal opportunity" to "participate in the political process and to elect representatives of their choice."   42 U. S. C. § 1973(b).

The trial court found that to create a second majority-black district in Georgia would require subordinating Georgia's traditional districting policies and allowing race to predominate.   922 F. Supp., at 1566.   We considered the determination in our discussion above and concluded it was well founded.   If race is the predominant motive in creating districts, strict scrutiny applies, *Bush* v. *Vera*, 517 U. S. 952, 962 (1996), and the districting plan must be narrowly tailored to serve a compelling governmental interest in order to survive.   We have assumed, without deciding, that compliance with § 2 can be a compelling state interest.   See, *e. g., id.*, at 977; *Miller* v. *Johnson*, 515 U. S., at 921.   Here, there was no "strong basis in evidence," *Shaw* v. *Reno*, 509 U. S., at 656 (internal quotation marks omitted), to conclude that vote dilution, in violation of § 2, would occur in consequence of the court's plan.   In fact, none of the three *Gingles* factors, the threshold findings for a vote dilution claim, were established here.   See *Bush, supra*, at 976–979.

Here the District Court found, without clear error, that the black population was not sufficiently compact for a second majority-black district.   922 F. Supp., at 1567.   So the first of the *Gingles* factors is not satisfied.   As we have noted before, § 2 does not require a State to create, on predominantly racial lines, a district that is not "reasonably

compact." *Johnson* v. *De Grandy*, 512 U. S. 997, 1008 (1994). And the § 2 compactness inquiry should take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Bush*, *supra*, at 977.

The trial court also found the second and third *Gingles* factors—the extent of racially polarized voting—wanting. In the Eleventh District inquiry, the District Court found that § 2 did not justify drawing racial lines, and it discussed evidence of racial polarization at great length. The court found the statistical evidence was for the most part inconclusive and conflicting, but that the State's expert, Dr. Joseph Katz, was convincing in his refutation of Dr. Allan Lichtman, the United States' expert. 864 F. Supp., at 1388. The court found "a significant degree of crossover voting in Georgia and the Eleventh District," *id.*, at 1390, and that the record "fail[ed] to demonstrate . . . chronic bloc voting," *id.*, at 1392. The court found that the average percentage of whites voting for black candidates across Georgia ranged from 22% to 38%, and the average percentage of blacks voting for white candidates ranged from 20% to 23%. *Id.*, at 1390. As the court noted, "[b]lack and black-preferred candidates in Georgia have achieved many electoral victories in local and statewide elections and have received significant—occasionally overwhelming—support from both black and white voters within the Eleventh Congressional District." *Id.*, at 1390–1391. The results of the 1992 Democratic primary in the Eleventh District suggested to the court "a general willingness of white voters to vote for black candidates": black candidates in that primary received about 55% of the white vote, and Cynthia McKinney, a black, won the runoff against a white with 23% of the white vote. *Id.*, at 1391.

For the inquiry concerning the Second District and the remedy, appellants relied exclusively on the Eleventh District trial record. After the remedy hearing, the District Court reaffirmed its earlier findings and cited additional evi-

dence of crossover voting. 922 F. Supp., at 1567. At the hearing concerning the Second District, Ms. Meggers stated that election results in the district indicated significant white crossover voting, and Representative Sanford Bishop, the black congressman elected in the Second District, agreed. Tr. 438, 142 (Oct. 30, 1995).

Appellants take issue with the District Court's assessment of the level of white crossover voting, but argue that, in any event, the level of polarization the District Court found is sufficient to satisfy the *Gingles* threshold. Under the circumstances, we cannot say the District Court clearly erred in finding insufficient racial polarization in voting to meet the *Gingles* requirements. The results of the 1996 general elections tend to support the District Court's earlier finding of "a general willingness of white voters to vote for black candidates." 864 F. Supp., at 1391. All three black incumbents won elections under the court plan, two in majority-white districts running against white candidates. (In *Gingles*, the Court indicated that incumbency is a "special circumstanc[e]" to be taken into account in evaluating racial bloc voting. 478 U. S., at 57. And in this action, the black candidates' success in two majority-white districts, quite different from their previous districts, is testimony to the "general willingness" of whites to vote for blacks.) These results also underscore the weakness of the Justice Department's methodology of calculating the likelihood of a black-preferred candidate winning based on strict racial percentages. Brief for United States 27, and n. 18. The Justice Department predicted that a black-preferred candidate "would likely be foreclosed from winning" in the court plan's Tenth District, and that "[t]he same result would follow even more clearly" in the court's Fourth District, which had a black voting age population of 33%. *Id.*, at 27. In fact, Representative McKinney won in the Fourth District.

Appellants argue the District Court's findings on § 2 are inconsistent and not owed deference, since the court held § 2

required maintenance of the majority-black Fifth District but not creation of a new majority-black district. The District Court found the black population in the Fifth District "is sufficiently compact and, being an urban minority population, has a sufficiently strong community of interest to warrant being a majority-minority district." 922 F. Supp., at 1568. The court also said the probability of electing a candidate is below 50% when the percentage of black registered voters is 50%, *ibid.*, and therefore the percentage of black registered voters should be kept as close to 55% as possible in the Fifth District. (The District Court noted, however, that it was uncomfortable using percentages of registered voters rather than voting age population, since "that in essence condones voter apathy." *Id.*, at 1568, n. 18.) The court made no explicit findings about differences in the racial polarization of voting between the Fifth and Eleventh Districts.

We do not agree that the District Court's maintenance of the Fifth District as a majority-black district under §2 indicates its §2 findings in reference to other districts are conflicting and not entitled to deference. The District Court noted that maintenance of a majority-black district in the Atlanta area—created in 1972 for compliance with the Voting Rights Act—had become a state districting policy. *Id.*, at 1565. Further, it is possible, although we do not express any opinion on the subject, that changing the racial majority of the district would have violated §5 retrogression principles.

Private appellants also argue no deference is due the District Court's §2 finding both because the court did not hold a separate hearing on whether its remedial plan violated §2 and because it barred private intervention to defend the constitutionality of the Second District. We do not agree. First, neither our precedents nor the Act require the court to hold a separate hearing on the adequacy under §2 of a remedial plan. Second, the private defendant-intervenors

had ample opportunity to present evidence of the need for a second majority-black district under § 2 at the remedy hearing, in which they fully participated. The finding that appellants have not shown the threshold *Gingles* factors for a § 2 violation is owed deference, and we find it not clearly erroneous.

### III

The private appellants contend the District Court's plan also violates § 5 of the Voting Rights Act. Although the Justice Department did not include this claim in its jurisdictional statement, it agrees with private appellants and briefed the issue.

As we noted above, § 5 requires covered jurisdictions to obtain either administrative preclearance by the Attorney General or approval from the United States District Court for the District of Columbia for any change in a "standard, practice, or procedure with respect to voting," and requires that the proposed change "not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U. S. C. § 1973c. We have explained that "the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U. S. 130, 141 (1976).

The question arises whether a court decree is subject to § 5. We have held that "[a] decree of the United States District Court is not within reach of Section 5 of the Voting Rights Act" such that it must be precleared. *Connor* v. *Johnson*, 402 U. S. 690, 691 (1971) *(per curiam)*. The exception applies to judicial plans, devised by the court itself, not to plans submitted to the court by the legislature of a covered jurisdiction in response to a determination of unconstitutionality. *McDaniel* v. *Sanchez*, 452 U. S. 130, 148–152 (1981). Here, the District Court made clear it had devised its own plan, a proposition not in dispute. In *Sanchez*, we

emphasized language in a Senate Committee Report saying that, although preclearance does not apply to court-devised plans, "'in fashioning the plan, the court should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases.'" *Id.*, at 149 (quoting S. Rep. No. 94–295, p. 19 (1975)). This is a reasonable standard, at the very least as an equitable factor to take into account, if not as a statutory mandate.

Appellants, however, have some difficulty fixing on a benchmark against which to measure any retrogression. Private appellants say the benchmark should be either the State's initial 1991 plan, containing two majority-black districts, or the State's "policy and goal of creating two majority black districts." Brief for Appellants 48. The Justice Department, for its part, contends the proper benchmark is the 1992 precleared plan, altered to cure its constitutional defects.

Here, as we have noted above in our discussions of both *Upham* and § 2, appellants have not demonstrated it was possible to create a second majority-black district within constitutional bounds. So, even were we to accept one of their proposed benchmarks, their desired remedy would be unconstitutional. As it happens, none of appellants' proposed benchmarks is appropriate. The private appellants' first proposal was not in effect in Georgia because it was refused preclearance. It thus could not operate as a benchmark under the Attorney General's regulations:

> "In determining whether a submitted change is retrogressive the Attorney General will normally compare the submitted change to the voting practice or procedure in effect at the time of the submission. If the existing practice or procedure upon submission was not in effect on the jurisdiction's applicable date for coverage . . . and is not otherwise legally enforceable under section 5, it cannot serve as a benchmark, and . . . the

comparison shall be with the last legally enforceable practice or procedure used by the jurisdiction." 28 CFR § 51.54(b)(1) (1996).

See also *Holder* v. *Hall*, 512 U. S. 874, 883–884 (1994) ("Under § 5, then, the proposed voting practice is measured against the existing voting practice . . . . The baseline for comparison is present by definition; it is the existing status. . . . [T]here is little difficulty in discerning the two voting practices to compare to determine whether retrogression would occur"); *Reno* v. *Bossier Parish School Board*, 520 U. S. 471, 478 (1997). There are sound reasons for requiring benchmarks to be plans that have been in effect; otherwise a myriad of benchmarks would be proposed in every case, with attendant confusion. This rule is all the more appropriate when one considers the attempt to use as a benchmark the State's supposed policy of creating two majority-black districts. And the Justice Department's proposed benchmark—the 1992 plan shorn of its constitutional defects—was also never in effect. Nor can the 1992 plan, constitutional defects and all, be the benchmark. Section 5 cannot be used to freeze in place the very aspects of a plan found unconstitutional.

The appropriate benchmark is, in fact, what the District Court concluded it would be: the 1982 plan, in effect for a decade. 922 F. Supp., at 1569, n. 20. Appellants have not shown that black voters in any particular district suffered a retrogression in their voting strength under the court plan measured against the 1982 plan. Absent such proof, there is no violation of § 5. We reject appellants' assertion that, even using the 1982 plan as a benchmark, the court's plan is retrogressive. They claim that under the 1982 plan 1 of the 10 districts (10%) was majority black, while under the District Court's plan 1 of 11 districts (9%) is majority black, and therefore blacks do not have the same electoral opportunities under the District Court's plan. Under that logic, each time a State with a majority-minority district was allowed to add

one new district because of population growth, it would have to be majority-minority. This the Voting Rights Act does not require.

## IV

Finally, appellants contend the District Court's plan violates the constitutional guarantee of one person, one vote under Article I, §2. This provision requires congressional districts to achieve population equality "as nearly as is practicable." *Wesberry* v. *Sanders*, 376 U. S. 1, 7–8 (1964). Court-ordered districts are held to higher standards of population equality than legislative ones. A court-ordered plan should "ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman* v. *Meier*, 420 U. S. 1, 26–27 (1975); *Connor* v. *Finch*, 431 U. S. 407, 414 (1977) (same). Here the District Court was not designing districts to remedy a one-person, one-vote violation, but courts should keep in mind that "absolute population equality [is] the paramount objective." *Karcher* v. *Daggett*, 462 U. S. 725, 732 (1983). Slight deviations are allowed under certain circumstances. *Chapman, supra*, at 26 ("With a court plan, any deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features"); *Connor, supra*, at 419–420 (same); *Karcher, supra*, at 740 ("Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent[s]").

To help in interpreting what follows, we explain a few terms. Overall population deviation is the difference in population between the two districts with the greatest disparity. Average population deviation is the average of all districts' deviation from perfect one-person, one-vote allocation. If population allocation in Georgia were perfect, each district would have 588,928 people, according to 1990 census data.

Here, the District Court plan has an overall population deviation of 0.35%, and an average deviation of 0.11%. The plan has a lower deviation than: the 1992 plan (with its 0.93% overall deviation and its 0.35% average deviation); the 1982 plan; or "any other plan presented to the Court which was not otherwise constitutionally defective." 922 F. Supp., at 1561. Private appellants and *amici* in fact proposed plans with much higher deviations. ACLU 1A, the "least change" plan, had an overall population deviation of 0.94%; Abrams C had an overall deviation of 0.99%; and the Lewis-Gingrich Amici-R plan came in last place with an overall deviation of 1.86%. The only plans with lower overall deviations than the court's plan were the Justice Department's Illustrative Plan (0.19%) and the ACLU's Abrams A (0.29%), whose constitutional infirmities are discussed above.

The District Court recited in detail those state policies and conditions which support the plan's slight deviations. The court explained Georgia's "strong historical preference" for not splitting counties outside the Atlanta area, 922 F. Supp., at 1561, and for not splitting precincts, *id.,* at 1562. (The court observed that some splitting of precincts was unavoidable in Cobb County because of noncontiguous annexation patterns, and that it had split some precincts in Clayton County to achieve lower population deviations. *Id.,* at 1562, n. 6.) The court acknowledged that maintaining political subdivisions alone was not enough to justify less than perfect deviation in a court plan. See, *e. g., Kirkpatrick* v. *Preisler,* 394 U. S. 526, 533–534 (1969) ("[W]e do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries"). The District Court, in conformance with this standard, considered splitting counties outside the Atlanta area, but found other factors "unique to Georgia" weighed against it. See *Chapman, supra,* at 26. These in-

cluded maintaining core districts and communities of interest. Georgia has an unusually high number of counties: 159, the greatest number of any State in the Union apart from the much-larger Texas. These small counties represent communities of interest to a much greater degree than is common, and we agree with the District Court that "such a proliferation" provides "ample building blocks for acceptable voting districts without chopping any of those blocks in half." 864 F. Supp., at 1377.

In any case, even if we had found the court plan's population deviation unacceptable, the solution would not be adoption of the constitutionally infirm, because race-based, plans of appellants. Indeed, before this Court at oral argument private appellants acknowledged the remedy for any one-person, one-vote violation would not be creation of a second majority-black district. Tr. of Oral Arg. 28–29. Rather, we would require some very minor changes in the court's plan—a few shiftings of precincts—to even out districts with the greatest deviations.

That exercise, however, and appellant's objections to the court plan's slight population deviations, are increasingly futile. We are now more than six years from the last census, on which appellants' data is based. The difference between the court plan's average deviation (0.11%) and the Illustrative Plan's (0.07%) is 0.04%, which represents 328 people out of a perfect district population of 588,928. The population of Georgia has not stood still. Georgia is one of the fastest-growing States, and continues to undergo population shifts and changes. U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 29 (1996) (Table 28) (showing Georgia tied for seventh place among the States in percentage of population growth from 1990 to 1995, with 11.2% growth). In light of these changes, the tinkerings appellants propose would not reflect Georgia's true population distribution in any event. The *Karcher* Court, in explaining the absolute equality standard, acknowledged that "census

data are not perfect," and that "population counts for particular localities are outdated long before they are completed." 462 U. S., at 732. *Karcher* was written only two years from the previous census, however, and we are now more than six years from one. The magnitude of population shifts since the census is far greater here than was likely to be so in *Karcher*. These equitable considerations disfavor requiring yet another reapportionment to correct the deviation.

## V

The task of redistricting is best left to state legislatures, elected by the people and as capable as the courts, if not more so, in balancing the myriad factors and traditions in legitimate districting policies. Here, the legislative process was first distorted and then unable to reach a solution. The District Court was left to embark on a delicate task with limited legislative guidance. The court was careful to take into account traditional state districting factors, and it remained sensitive to the constitutional requirement of equal protection of the laws.

\* \* \*

The judgment of the District Court is affirmed.

*It is so ordered.*

[Appendix to opinion of the Court follows this page.]

# APPENDIX TO OPINION OF THE COURT

Figure 3

1995
Court Plan

Figure 2

1992
Unconstitutional Plan

Figure

1991 Uncleared
General Assembly Plan

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

Georgia elects 11 Members of the United States House of Representatives. Georgia's African-American voting age population is just over 1.7 million, or about 27 percent of a total voting age population of about 6.5 million. See *Miller* v. *Johnson,* 515 U. S. 900, 906 (1995). In 1992 Georgia's Legislature redrew congressional district boundaries so as to create an African-American voting age majority in 3 of 11 districts. This Court held that three-district plan unconstitutional. *Id.,* at 928. On remand, the District Court, *inter alia,* drew up a new redistricting plan with *one* majority-minority district. *Johnson* v. *Miller,* 922 F. Supp. 1556, 1560–1561 (SD Ga. 1995). The basic legal issue before us now is whether the District Court should have retained (not one but) *two* majority-minority districts.

The majority holds that the District Court could lawfully create a new districting plan that retained only one such district. But in my view that decision departs dramatically from the Georgia Legislature's preference for two such districts—a preference embodied in the legislature's earlier congressional district plans. A two-district plan is not unconstitutional. And the District Court here, like the District Court in *Upham* v. *Seamon,* 456 U. S. 37, 43 (1982) *(per curiam),* "was not free . . . to disregard the political program of the . . . Legislature." For that reason, and others, I dissent.

## I

The majority fully understands the relevance, and the importance, here of this Court's *Upham* decision. In *Upham* the Court said:

> " 'Just as a federal district court . . . should follow the policies and preferences of the State, as expressed . . . in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution,

. . . a district court should similarly honor state policies in the context of congressional reapportionment.'" *Id.,* at 41 (quoting *White* v. *Weiser,* 412 U. S. 783, 794–795 (1973)).

The majority here, referring to this language, agrees:

"[A] court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Ante,* at 79 (citing *Upham, supra,* at 43).

It is therefore common ground among us that the District Court should have drawn boundaries so as to leave two majority-minority districts rather than one—*unless* there was no such state policy or preference; *unless* the creation of two such districts would have violated the Constitution or the Voting Rights Act of 1965; or *unless* doing so simply would have proved impractical in light of other important districting objectives. See *Upham, supra,* at 41–42 (quoting *White, supra,* at 794–795). Unlike the majority, I cannot find present here any of these three countervailing justifications.

A

No one denies that, if one looks at the redistricting plans proposed by the Georgia Legislature, one will find in them expressions of state "'policies and preferences'" for two majority-minority districts. 456 U. S., at 41; see also Appendix to this opinion (Appendix), 1991 Plan, *infra.* After the 1990 Census, which increased the size of Georgia's congressional delegation from 10 to 11, App. in *Miller* v. *Johnson,* O. T. 1994, No. 94–631, p. 9, the state legislature began a lengthy political process of redistricting and considered the majority-minority district issue, among others. *Id.,* at 10–14; see also Deposition of Linda Meggers, Record 11–17, 20–22, 32–33, 85 (May 6, 1994). The legislature proposed one plan in 1991 with two such districts. See Appendix,

1991 Plan, *infra.* When the United States Department of Justice (DOJ or Justice Department) denied preclearance under § 5 of the Voting Rights Act of 1965 (VRA), 42 U. S. C. § 1973, the legislature proposed a second plan, which also contained two such districts. Subsequently the legislature proposed a third plan with three such districts—a plan approved by the Justice Department but struck down by this Court in *Miller, supra.*

What the District Court and the majority deny is that the "preferences" expressed in these three redistricting plans reflect the Georgia Legislature's *true* preference. The District Court said that "Georgia's current plan was not the product of Georgia's legislative will," but rather "was tainted by unconstitutional DOJ interference" into the "process" that produced the plan. 922 F. Supp., at 1560. The majority repeats the District Court's comment about DOJ's "thorough 'subversion of the redistricting process' since the 1990 census," *ante,* at 84, adds that the "State was predominantly driven" by "steady Justice Department pressure," *ante,* at 86, and concludes:

> "Interference by the Justice Department . . . disturbed any sound basis to defer to the 1991 unprecleared plan . . . ." *Ante,* at 90.

I believe, however, that the majority's conclusion—its reason for refusing to recognize the Georgia Legislature's two-district preference—is wrong both as a matter of fact and as a matter of law.

The conclusion is factually inadequate because the testimony cited, *ante,* at 86–87, to show unusual DOJ pressure in the 1991 redistricting process shows nothing unusual. It shows only that the Justice Department told Georgia that it must comply with the VRA, which statement Georgia legislators might have considered an exhortation to create more than one majority-minority district. Tr. 16 (Apr. 18, 1994); *id.,* at 431–433 (Oct. 30, 1995); Deposition of Linda Meggers,

*supra,* at 20. Indeed, the record indicates that a number of Georgia legislators affirmatively wanted two majority-minority districts. Tr. 431–432 (Oct. 30, 1995); Deposition of Linda Meggers, *supra,* at 22, 32. It also shows that the 1991 two-district plan was the result of an " 'understanding' between the leadership in the legislature and the black caucus." *Ante,* at 87; see also Tr. 32 (Apr. 18, 1994); *id.,* at 431–432 (Oct. 30, 1995); Deposition of Linda Meggers, *supra,* at 22, 32; that the 1991 "two district" plan (as the State conceded) "was not perceived as a 'racial gerrymander,' " *ante,* at 86 (quoting Brief for Appellants Miller et al. in *Miller* v. *Johnson,* O. T. 1994, No. 94–631, p. 49); and that the 1991 "two district" plan (as the District Court found), "like most redistricting efforts, was the culmination of committee meetings, public hearings, examination of various districting proposals, and many hours spent with an extremely sophisticated computer." *Johnson* v. *Miller,* 864 F. Supp. 1354, 1363 (1994). Indeed, much of the departmental "interference" to which the majority refers took place *after adoption* of the 1991 plan, see *ante,* at 80; Tr. 21, 39–40, 43, 75 (Oct. 30, 1995); Deposition of Linda Meggers, *supra,* at 79–80; *Miller,* 515 U. S., at 906–907; App. in No. 94–641, p. 16, and likely reflected departmental concern related to Georgia's voting discrimination history. See *Busbee* v. *Smith,* 549 F. Supp. 494, 500, aff'd, 459 U. S. 1166 (1982); App. 139–140.

The majority is legally wrong because this Court has said that a court should determine a State's redistricting preferences by looking to the " 'plans proposed by the state legislature,' " *Upham,* 456 U. S., at 41 (quoting *White,* 412 U. S., at 794–795), not by evaluating the various political pressures that might have led individual legislators to vote one way rather than another (or, for that matter, by reviewing after-the-fact testimony regarding legislative intent). Cf. *Upham, supra,* at 41; *White, supra,* at 794–795; see also *Karcher* v. *Daggett,* 462 U. S. 725, 740 (1983). " 'Districting plans,' " like other legislative Acts, " 'are integrated bundles

of compromises, deals, and principles.'" *Bush* v. *Vera*, 517 U. S. 952, 1059 (1996) (SOUTER, J., dissenting) (quoting Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances after *Shaw* v. *Reno*, 92 Mich. L. Rev. 483, 585–586 (1993)). District plans, like other legislative Acts, may reflect not only reasoned argument but also political pressures, brought to bear by many different individuals and groups using subtle or unsubtle suggestions, promises, or threats of votes, support, publicity, and even lawsuits.

How can a court say that a legislative Act is legitimate— that it reflects legislative preferences or policies—when those who reason or cajole (or threaten suit) are farmers, businessmen, or consumer groups, but that the same legislative Act becomes illegitimate—that it does not reflect "true" legislative policy or preference—simply because those who seek to persuade (or threaten suit) represent the Justice Department. One cannot say that the Justice Department's power is any less legitimate than that exercised by the many other groups that seek to influence legislative decisions; and its employees' sworn duty to uphold the law would seem more suitably characterized as a reason for paying greater attention to its views rather than as a reason for heeding them less. Regardless, I am not aware of any legal principle that supports the kind of distinction (among legislative pressures) that the District Court made; and the District Court's necessary reliance upon such a distinction, by itself, should warrant vacating the District Court's decision.

Moreover, what reason is there to believe that Georgia's Legislature did not "really" want the two majority-minority districts that its earlier plans created? There is—as I indicated earlier—evidence that a number of legislators *did* want two majority-minority districts. See *supra*, at 106. And the legislature was aware of Georgia's long, well-documented history of past discrimination in voting. See *Busbee, supra; Rogers* v. *Lodge*, 458 U. S. 613 (1982); *Gray* v.

*Sanders,* 372 U. S. 368 (1963); see also *Morris* v. *Fortson,* 261 F. Supp. 538, 541 (ND Ga. 1966); *Lodge* v. *Buxton,* 639 F. 2d 1358, 1378 (CA5 1981) (racial bloc voting in Burke County); *Carrollton Branch of NAACP* v. *Stallings,* 829 F. 2d 1547, 1559 (CA11 1987) (racial bloc voting in Carroll County); *Cross* v. *Baxter,* 604 F. 2d 875, 880, n. 8 (CA5 1979); *Paige* v. *Gray,* 437 F. Supp. 137, 158 (MD Ga. 1977) (Albany, Ga.); *Pitts* v. *Busbee,* 395 F. Supp. 35, 40 (ND Ga. 1975) (Fulton County); *Bailey* v. *Vining,* 514 F. Supp. 452, 461 (MD Ga. 1981) (Putnam County); *Wilkes County* v. *United States,* 450 F. Supp. 1171, 1174 (DC 1978); see generally E. Foner, Reconstruction: America's Unfinished Revolution, 1863–1877, pp. 423–424 (1988); McDonald, Binford, & Johnson, Georgia, in Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990, pp. 67–74 (C. Davidson & B. Grofman eds. 1994).

The Georgia Legislature was likely aware of the many unfortunate consequences that have flowed from this history. They include the facts that, when Congress first enacted the VRA, fewer than 30 percent of African-Americans eligible to vote in Georgia had registered to vote, *ibid.,* and that no African-American had represented Georgia in Congress since Reconstruction, App. 140, when Congressman Jefferson Franklin Long briefly represented the State. B. Ragsdale & J. Treese, Black Americans in Congress, 1870–1989, p. 81 (1990).

The Georgia Legislature also might have thought that some degree of (indeed, a less than proportionate amount of) majority-minority districting could help to overcome some of the problems these facts suggest. Forty-two members of Georgia's (180 member) House of Representatives themselves were elected from majority-black districts; 30 of those members are black, 12 are white. App. 116. One hundred thirty-eight members of Georgia's House were elected from majority-white districts; 1 of those members is black, 137 are white. *Ibid.* Forty-three members of Georgia's (56 mem-

ber) Senate are elected from majority-white districts; all of those members are white. *Ibid.* Until 1972, Georgia had not elected any African-American Members of Congress since Reconstruction. 1 Reference Library of Black America 67 (K. Estell ed. 1994). Since then, it has elected a total of four. Sherman, Diluting Black Votes for a Stronger Voice; Politicians Debate Impact of Remap, Atlanta Journal-Constitution, Dec. 17, 1995, p. G3. Each of those Members originally represented a majority-minority district (although two of them were recently reelected as incumbents after boundary changes created white majorities in their districts). *Ante*, at 93.

These circumstances help to explain why the 1991 Georgia Legislature might have thought that the creation of two majority-minority districts would help overcome · race-related barriers—barriers erected by history and prejudice, reinforced by inertia and nonparticipation. Not only the three-district plan, but also the 1991 plan and the first (uncleared) 1992 plan suggest that that is what the legislature *did* think. And I can find no reason in the record *not* to take at face value what all the legislature's plans thereby suggest, namely, that two majority-minority districts represent a significant legislative "policy and preference."

## B

The majority says that the legislature's two-district preference is not owed *Upham* deference because a plan that embodied that preference is (or would be) "flawed by evidence of predominant racial motive," *ante*, at 90, or based upon race to a degree not reasonably necessary to comply with § 2 of the VRA, 42 U. S. C. § 1973. The majority means that a two-district plan would be unlawful—that it would violate the Constitution as interpreted in *Miller*. I cannot agree.

*Miller* considered the constitutionality of a *three*-district plan. Its five-Justice majority included one Member who

subsequently made clear that, even if racial considerations "predominate" in a State's drawing of a district boundary, that district is *nonetheless lawful* (because there is a compelling, hence redeeming, interest) if the State has "a strong basis in evidence for concluding" that the district would otherwise violate VRA § 2. *Bush,* 517 U. S., at 994 (O'CONNOR, J., concurring); see also *Miller,* 515 U. S., at 921; *Shaw* v. *Reno,* 509 U. S. 630, 656–657 (1993). That " 'strong basis in evidence' need not take any particular form," *Bush,* 517 U. S., at 994 (O'CONNOR, J., concurring), and where it is present, the State "may create a majority-minority district without awaiting judicial findings," *ibid.;* see also *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S. 267, 289–291 (1986) (O'CONNOR, J., concurring); *McDaniel* v. *Barresi,* 402 U. S. 39, 41 (1971). The majority does not reject this standard. *Ante,* at 90–91. And it cannot deny that there is a "strong basis in the evidence" for believing that, after the 1990 census, VRA § 2, § 5, or both, required the creation of a second majority-minority district.

As the majority agrees, § 2 requires a second majority-minority district here, if the "totality of [the] circumstances" suggests that racial minorities are excluded from "participat[ing] in the political process" and "elect[ing] representatives of their choice," 42 U. S. C. § 1973(b), and the evidence shows that (1) the minority group "is sufficiently large and geographically compact to constitute a majority" in a second "single-member district"; (2) the minority group is "politically cohesive"; and (3) the majority "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg* v. *Gingles,* 478 U. S. 30, 50–51 (1986).

The majority discusses only these last *(Gingles)* requirements at any length. As to the first requirement—compactness—the plans before the District Court raised two possibilities: first, the creation of a majority-minority district in southwest Georgia—in approximately the area labeled Dis-

trict 2 in the court's plan (Appendix, 1995 Court Plan, *infra*); and second, the creation of the majority-minority district in southeastern central Georgia—in approximately the area labeled District 11 in the Justice Department's Illustrative Plan (Appendix, Illustrative Plan, *infra*).

The first possibility could have involved a compactly shaped district. Regardless, the DOJ's Illustrative Plan (which the District Court considered on the merits, 922 F. Supp., at 1561, n. 4) suggests a newly drawn District 11 with an African-American population of 54.60 percent, an African-American voting age population of 51.04 percent, and a population deviation of 0.10. (This deviation percentage—the highest in the Illustrative Plan—was still lower than the deviation in two of the districts contained in the Court Plan.) It suggests that the District Court's statement that "the only way Georgia could create a majority-minority district out of the minority concentrations in east-central Georgia was to link" rural and urban communities by using "land bridges and appendages" similar to those used in the unconstitutional 1992 plan, 922 F. Supp., at 1566, n. 15, was erroneous. The proposed district is different from its unconstitutional predecessor. It does not try to build a land bridge linking southern Atlanta with Savannah. Cf. *Miller*, *supra*, at 908. And its boundaries are far more regular.

Moreover, it strikes me that the District Court's finding that a district in east-central Georgia that encompassed both rural and urban African-American communities could not be "compact" confuses a number of issues. *Shaw* v. *Reno* and *Miller* compactness, which concerns the shape or boundaries of a district, differs from § 2 compactness, which concerns a minority group's compactness. Additionally, where (as here) the racial minority group is geographically compact, see Appendix, Illustrative Plan, *infra*, the fact that communities are rural or urban has more to do with political cohesiveness—whether communities share common interests—than with § 2 compactness. To my knowledge, no case has

ever held that rural and urban racial minorities *cannot* together create a compact minority for § 2 compactness purposes. Moreover, it seems clear that rural and urban African-American voters who live near each other *might* share important common interests; and I have found nothing in the record that suggests that the rural and urban black voters here, living near each other, do not share many common interests—in respect to many important legislative matters. See Karlan & Levinson, Why Voting Is Different, 84 Calif. L. Rev. 1201, 1216–1220 (1996); see also *Gingles, supra,* at 64 (citing Butler, Constitutional and Statutory Challenges to Election Structures: Dilution and the Value of the Right to Vote, 42 La. L. Rev. 851, 902 (1982), and S. Verba & N. Nie, Participation in America 151–152 (1972)).

The District Court considered the remaining two *Gingles* factors (the minority's "political cohesiveness" and the majority's "bloc voting") under a single rubric, which the majority calls "the extent of racially polarized voting." *Ante,* at 92. Of course, Georgia's history, including the political results that I have mentioned before—the fact that African-American representatives have come almost exclusively from majority-minority districts—strongly support the existence of that "polarization." Moreover, appellants produced experts who testified that the percentage of District 11 white voters willing to vote for a black candidate varied from 0 to 26 percent, while the number of black voters willing to vote for a white candidate varied from 3 to 11 percent. App. 54–61, 69–70, 72. Other expert testimony suggested less polarization (placing the relevant numbers at 22 to 38 percent white-for-black and 20 percent to 23 percent black-for-white). *Johnson* v. *Miller,* 864 F. Supp., at 1390. But that other testimony rested in considerable part on local (and judicial, and primary) election results with multiple candidates or other special features that discouraged racial bloc voting, and for that reason they may have overstated

the significance of the numerical results. See App. 93–94; *Gingles*, 478 U. S., at 57, nn. 25 and 26.

Regardless, as the majority says, the District Court found the statistical evidence inconclusive and "conflicting." 922 F. Supp., at 1567. And the District Court conceded the existence of "some degree of vote polarization." *Ibid.* (It simply said that the "degree" was not "'alarming.'" *Ibid.*) That African-American incumbents were reelected does not, without more, disprove polarization. *Gingles, supra*, at 75 ("'[T]he election of a few minority candidates does not "necessarily foreclose the possibility of dilution of the black vote . . ."'") (quoting S. Rep. No. 97–417, p. 29, n. 115 (1982), in turn quoting *Zimmer* v. *McKeithen*, 485 F. 2d 1297, 1307 (CA5 1973) (en banc), aff'd *sub nom. East Carroll Parish School Bd.* v. *Marshall*, 424 U. S. 636 (1976) *(per curiam)*); 478 U. S., at 75 (citing S. Rep. No. 97–417, *supra*, at 29, n. 115) (listing incumbency as a special factor in assessing vote polarization).

The majority says that, despite this evidence, the District Court's findings—of no § 2 violation and no § 5 violation—are adequately supported. *Ante*, at 94, 97. But that is because the District Court asked the wrong question. We need not decide whether the evidence shows the failure to create a second majority-minority district violates § 2. Cf. *ante*, at 90–95. (Nor, for that matter, need we decide whether the consequent reduction of such districts from 1 in 10 to 1 in 11 would, other things being equal, violate § 5—which it might do. Cf. *ante*, at 95–98.) The question is not about whether the evidence proves § 2 *in fact requires* two majority-minority districts. The question is whether the evidence is strong enough to justify a legislature's reasonable belief that that was so. The record rather clearly demonstrates a "strong basis in the evidence" for *believing* that § 2 or § 5 required two majority-minority districts. The legislature thus could very reasonably have believed that was so. And, that is what I had believed the law, as set forth in this

Court's opinions, required as legal justification for a district that otherwise would violate the basic predominant factor test of *Miller*.

This legal distinction—between whether a plan really violates §2 or might well violate §2—may seem technical. But it is not. A legal rule that permits legislatures to take account of race only when §2 *really* requires them to do so is a rule that shifts the power to redistrict from legislatures to federal courts (for only the latter can say what §2 *really* requires). A rule that rests upon a reasonable view of the evidence (*i. e.*, that permits the legislature to use race if it has a *"strong basis" for believing* it necessary to do so) is a rule that leaves at least a modicum of discretionary (race-related) redistricting authority in the hands of legislators. Again (and at a minimum), the District Court's use of the wrong test requires vacating its judgment.

## C

To create a second majority-minority district is not impractical nor would doing so significantly interfere with other important districting objectives. The easiest way to understand why this is so is to look at three plans that I have placed in the Appendix, *infra*. I shall call the Georgia Legislature's 1991 two-district reapportionment Plan A. Appendix, 1991 Plan, *infra*. I shall call the one-district plan adopted by the court Plan B. Appendix, 1995 Court Plan, *infra*. And I shall call the two-district Illustrative Plan proposed by the Justice Department Plan C. Appendix, Illustrative Plan, *infra*. Inspection of the three plans suggests that the District Court's plan (B) is very similar to the other two (A and C) but for one critical feature, namely, that it has one majority-minority district rather than two.

Now consider the three plans in respect to each of the five districting considerations that the District Court called traditional and important. They are: (a) retaining one district in each corner of the State; (b) creating an urban minor-

ity district; (c) maintaining political subdivisions; (d) protecting incumbents; and (e) maintaining traditional district cores. 922 F. Supp., at 1564–1565.

All three plans are identical in respect to the first two considerations. Each maintains districts in three of the four state corners; each creates at least one urban minority district. Plan B—the District Court's plan—is marginally superior in respect to the third criterion (maintaining political subdivisions). Plan B splits six counties within the Atlanta area but none outside the Atlanta area. *Id.*, at 1564. Plan C splits two counties (Bibb and Muscogee) outside the Atlanta area. (Appellants, however, advance nonracial justifications for the latter splits.)

Plan C is superior to Plan B in respect to the remaining two considerations. Plan C displaces no incumbents. Plan B displaces three incumbents (including two African-Americans). Plan C maintains all district cores. Plan B moves many more Georgians into new districts.

Plan C has certain other advantages: It maintains, as provided in the legislature's 1991 plan, 138 of Georgia's 159 counties. Plan B maintains 123. Plan C has greater population uniformity among its districts. And, of course, Plan C provides for two majority-minority districts—the number the legislature provided in two of its three redistricting plans.

I add one point. This is not a suit in which there are claims of interference with the right to cast a ballot or "dilution" of the majority's vote. Cf. *White* v. *Regester,* 412 U. S. 755 (1973); *Reynolds* v. *Sims,* 377 U. S. 533 (1964); and *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960); see also Karlan & Levinson, 84 Calif. L. Rev., at 1212–1216. Rather, the legislature's plans, insofar as they were race conscious, sought only to prevent what the legislature could reasonably have believed to be unlawful vote dilution—*i. e.,* to prevent a violation of VRA § 2, or perhaps § 5. See Tr. 103 (Oct. 30, 1995) (testimony of Rep. Sanford Bishop). Given this fact and given the three sets of considerations just mentioned, I do

not see how the majority, consistently with *Upham,* can affirm the District Court's determination.

## II

In other cases dissenting judges have expressed concerns that the Court's holdings and particularly its test—"predominant racial motive"—would prove unworkable, that they would improperly shift redistricting authority from legislatures to courts, and that they would prevent the legitimate use (among others the remedial use) of race as a political factor in redistricting, sometimes making unfair distinctions between racial minorities and others. See, *e. g., Shaw* v. *Reno,* 509 U. S., at 676–679 (STEVENS, J., dissenting); *id.,* at 679–687 (SOUTER, J., dissenting); *Miller,* 515 U. S., at 929 (STEVENS, J., dissenting); *id.,* at 934 (GINSBURG, J., dissenting); *Bush,* 517 U. S., at 1003 (STEVENS, J., dissenting); *id.,* at 1045 (SOUTER, J., dissenting); *Shaw* v. *Hunt,* 517 U. S. 899, 918 (1996) (STEVENS, J., dissenting). This suit exacerbates those concerns.

Legislators, for example, may ask just what the words "predominant racial motive" mean. The question has no obvious answer because racial motives (here efforts to include some additional African-American voters in a particular district) *never* explain a predominant portion of a district's entire boundary (most of which inevitably reflects county lines, other geographical features, and sometimes even a discriminatory history, see App. 120–121); yet those motives *always* predominate in respect to those voters (whether few or many) whom the legislature, with consciousness of race, places for that reason in one district rather than another. More importantly, here, unlike other cases that use somewhat similar words, the Court has not turned to other considerations, such as discriminatory intent, or vote dilution, or even a district's bizarre geographical shape, to help explain, or to limit the scope of, the words themselves. Cf. *Shaw* v. *Hunt, supra; Regester, supra; Reynolds, supra;* and *Gomil-*

*lion, supra.* Thus, given today's suit, a legislator might reasonably wonder whether he can ever knowingly place racial minorities in a district because, for example, he considers them part of a "community" already there; because he thinks doing so will favor the Democrats (or the Republicans); because he wants to help an African-American incumbent; because he believes doing so will encourage participation in the political process by racial minorities in whom historical discrimination has induced apathy; because he believes that doing so will help those same voters secure representatives that better reflect their needs and desires; or simply because he wants to see more racial minorities elected to office in a Nation that has become increasingly diverse.

The Court has not said that the Constitution forbids the use of race in all these instances. See *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 237 (1995); see also *Shaw* v. *Reno, supra,* at 646–647; *Miller, supra,* at 920; *Bush, supra,* at 1004 (STEVENS, J., dissenting); *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S., at 280; *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 493–494 (1989). If the use of race as a criterion is wrong in some, but not all, of these instances, the legislator will need to know when, and why. And the legislator will need a legal principle that tells him whether, or when, the answers to such questions vary depending upon whether the group is racial or reflects, say, economics, education, or national origin. *Miller, supra,* at 944–945 (GINSBURG, J., dissenting). It seems particularly difficult—without the use of some guiding or limiting principle, such as intent, vote dilution, or even bizarre district shape—to find principled legal answers to what, in the redistricting context, are traditionally political questions.

The decision also increases the risk of significant judicial entanglement in the inherently political redistricting process. See, *e. g., Bush, supra,* at 1035–1040 (STEVENS, J., dissenting); *Miller, supra,* at 934–935 (GINSBURG, J., dissenting); see also *Growe* v. *Emison,* 507 U. S. 25, 33–34 (1993);

*Voinovich* v. *Quilter,* 507 U. S. 146, 156–157 (1993); *Chapman* v. *Meier,* 420 U. S. 1, 26 (1975); *White, supra,* at 795; *Reynolds,* 377 U. S., at 586; *Colegrove* v. *Green,* 328 U. S. 549, 552–554 (1946). A Court test that forbids the overt use of race in any (or all) of the circumstances listed above will simultaneously permit plaintiffs to bring lawsuits complaining about the covert use of what was overtly forbidden. Any redistricting plan will generate potentially injured plaintiffs, willing and able to carry on their political battles in a judicial forum. And judges (unable to refer, say, to intent, dilution, shape, or some other limiting principle) will find it difficult to dismiss those claims—particularly if (as the majority here says) the law deprives the legislature even of such defenses as a reasonable belief that a particular use of race was legally required.

Nor can I find any legal principle that might constitute a simple, administrable stopping place—a principle that could serve the same function in this context as does the one-person, one-vote rule in the context of reapportionment. See *Miller, supra,* at 938–939 (GINSBURG, J., dissenting). A simple "color blind" test—a test that rules out race consciousness across the board—will not work. *Bush, supra,* at 1060–1062 (SOUTER, J., dissenting). Legislators can and should use race consciously to prevent creating districting plans that discriminate against racial minorities, say, by "diluting" their votes. Cf. *Adarand Constructors, Inc.,* 515 U. S., at 237. Moreover, this Court, recognizing the harm caused by slavery and 80 subsequent years of legal segregation, has held that legislators, within limits, can make conscious use of race in an effort to overcome the present effects of past discrimination. *Ibid.;* see also *Shaw* v. *Reno, supra,* at 646–647; *Miller,* 515 U. S., at 920. There may be other instances as well. Further, any test that applied only to race, ignoring, say, religion or national origin, would place at a *dis*advantage the very group, African-Americans, whom the Civil War Amendments sought to help, see *id.,* at 936–

938 (GINSBURG, J., dissenting).   But judicial administration of a test that applied to all such voter group characteristics would involve courts yet more deeply in the basically political task of drawing and redrawing district boundaries.

In focusing on these practical considerations, I repeat what previous dissents have argued.   I do so because the holding here underscores the problems mentioned in those earlier dissents; and those problems, in turn, cast further doubt upon the soundness of today's decision.

## III

I do not necessarily agree or disagree with those other aspects of the majority's opinion that I have not mentioned. But I shall stop with the main point.   The Court, perhaps by focusing upon what it considered to be unreasonably pervasive positive use of race as a redistricting factor, has created a legal doctrine that will unreasonably restrict legislators' use of race, even for the most benign, or antidiscriminatory, purposes.   And that doctrine will draw the Court too deeply into an area of legislative responsibility.   For the reasons set forth here, and in previous dissenting opinions, I do not believe that the Constitution embodies the doctrine that the majority enunciates.   And I believe that *Upham* requires us to vacate the District Court's judgment and remand the suit.

[Appendix to opinion of BREYER, J., follows this page.]

# APPENDIX TO OPINION OF BREYER, J.

1991 Plan

1995 Court Plan

Illustrative Plan