PERRY, J.,
concurring.
I concur fully with my esteemed colleague, Justice Pariente, but write to highlight concern regarding the appearance that “the Legislature is utilizing its interest in protecting minority voting strength as a shield.” Majority op. at 626. While nothing in the record before us has proven that the Legislature so acted, I write to caution against even the appearance of the *693 Legislature diminishing the ability of minority voters to elect effective representation. The appearance of impropriety is as bad as impropriety itself. I am fearful that we have cloaked ourselves in a permissive standard of review where the Legislature need not demonstrate its adherence to each of the new constitutional mandates.
It concerns me that under the guise of minority protection, there is — at the very least — an appearance that the redistricting process sought to silence the very representatives of the people the Legislature indicates it is trying to protect.[66] For example, during floor debate one such representative, Senator Arthenia Joyner, rose in opposition to the redistricting plan, stating:
I believe that [the reapportionment plan] was prepared in violation of Florida’s Redistricting standards. Specifically I believe the Legislature is poised to use the pretext of minority protection to advance an agenda that seeks to preserve incumbency and pack minority seats in order to benefit a particular party.
Packing a district with more minority voters than is necessary to create an opportunity to elect representatives of choice bleaches surrounding districts and limits the influence of minorities overall.
[[Image here]]
Our maps actually fail to create new opportunities for minorities to participate in the political process and elect their representatives of choice. While this plan does guarantee a certain number of black Legislators will be elected, it also ensures that we will be in a perpetual minority in the House and the Senate with little ability to advance an agenda that will benefit the very people we represent.
I believe this approach will, as it has in the past, continue to diminish the ability of our communities of color to impact the legislative process. The Legislature has shown a clear indifference to many of the issues we have fought for because we are a part of such a small minority. They just do not have to listen to our constituents.
[[Image here]]
... Ironically at precisely the same time so many were declaring their support of the Voting Rights Act. I am not aware of a single member of the Legislature who spoke out against the current Secretary of State’s efforts to declare Section V of the Voting Rights Act inapplicable to the regions in Florida that have had heightened histories of racism.
Having thus expressed her concerns that minorities were packed into districts in numbers greater than necessary for them to elect the representative of their choice, thereby limiting their ability to influence adjacent districts, she was told “tough luck.”
Likewise, Senator Nan Rich rose in opposition, stating eloquently:
Two years ago ... the voters could not have spoken louder or with more clarity. They said they were tired of elected officials drawing seats that favored themselves or their party of choice and their voices could not have been stronger.
In an election when our Governor failed to get even a majority of the *694 electorate, Floridians agreed on the Fair District standards by 68 percent, yet we are here today considering maps that I believe are drawn in violation of Fair District standards.
[[Image here]]
While everybody professed their great desire to support minority voters, I agree with my friend, Senator Joyner, who believes that for too long the so-called protection of minority voters has been used by this Legislature as a pretext to draw seats that preserve incumbency and advance the interest of a particular political party.
Bleaching seats in the name of minority protection is a practice that must be resisted. It ultimately diminishes the impact minority voters have in the governance of this state and makes it easy for communities of color to be neglected by the vast majority of elected officials.
[[Image here]]
In spite of all of that I believe the maps that are being passed out today look a lot like the ones the voters were hoping would be gone when they passed Amendment 6. This plan still protects incumbents. It still gerrymanders, it still has districts that meander around the state with no apparent logic and it will still very likely result in a Congressional delegation that is grossly disproportionate to the partisan makeup of this state.
Certainly, the Senate was tasked with maintaining the delicate balance between righting an historical, racist wrong and moving forward into an era of racial equality where one person, one vote is not quantified by the color of the voter. However, as stated by Justice Pariente:
Racial classifications of any sort pose the risk of lasting harm to our society. They reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin. Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters — a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.
Majority op. at 627 (quoting Shaw, 509 U.S. at 657, 113 S.Ct. 2816).
Further, while I also agree that “a minority group’s ability to elect a candidate of choice depends upon more than just population figures,” majority op. at 625, 627, I cannot agree that there was a rational basis for the Senate to decide to turn a blind eye to population data when drawing their plan, see concurring in part and dissenting in part op. at 695. By refusing any attempt to draw more compact districts while maintaining the required racial proportions, there is at least the appearance that the Senate thumbed its nose at the will of the people. This Court finds that on this record, “the Senate plan does not facially dilute a minority group’s voting strength or cause retrogression under Florida law,” majority op. at 655; however, when the outcome appears to be antithetical to minority interest, I am skeptical when the burden is not on the Legislature to demonstrate that despite such appearance, the underlying intent is ultimately valid. Because the Senate now has “the benefit of our opinion when drawing its plant,]” majority op. at 656, it is my hope that there is no further appearance of misuse of Florida’s minority voting protection provision.
*695 With all due respect, Justice Canady’s reliance on Perry is misplaced. Significantly, there the federal court was tasked with redrawing the districts for the State of Texas; it was not a state court review under the state constitution. Secondly, the claims were presented under the Federal Voting Rights Act and the United States Constitution. The Supreme Court was balancing the right of the State of Texas to undergo the redistricting process without substituting its policies for that of the United States Supreme Court. Perry, 132 S.Ct. at 941 (“This Court has observed before that ‘faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying’ a state plan — even one that was itself unenforceable — ‘to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.’ ”) (quoting Abrams v. Johnson, 521 U.S. 74, 79, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997)).
Here, we are tasked with reviewing the reapportionment plan by interpreting Florida’s new constitutional minority protection provision. The people of Florida voted to add these new redistricting mandates. They “could not have spoken louder or with more clarity.” As recognized by the majority, the citizens of Florida have entrusted us to interpret and apply these constitutional standards. We cannot simply be a rubber stamp for the Legislature’s interpretation of the constitution. We therefore “reeognize[] our independent constitutional obligation to interpret our own state constitutional provisions.” Majority op. at 621.

. I note that each of the House members of the Florida Conference of Legislative Black State Legislators voted against the reapportionment plan. Floor Vote on SJR 1176, 2012 Session (Fla. Feb. 3, 2012), http://www. myfloridahouse.gov/Sections/Bills/floorvote. aspx?VoteId=12689&BillId=48155&&.