GEORGIA STATE CONFERENCE OF THE NAACP, et al., Plaintiffs,

v.

FAYETTE COUNTY BOARD OF COMMISSIONERS, et al., Defendants.

No. 3:11–cv–00123–TCB.

United States District Court, N.D. Georgia, Newnan Division.

Signed Aug. 3, 2015.

Christopher Kemmitt, NAACP Legal Defense and Education Fund, Inc., Washington, DC, Deuel Ross, American Civil Liberties Union Foundation, Leah C. Aden, Natasha Korgaonkar, Victorien Wu, NAACP Legal Defense And Education Fund, Inc., New York, NY, Neil T. Bradley Law Office of Neil Bradley, Avondale Estates, GA, for Plaintiffs.

Anne Ware Lewis, Frank B. Strickland, Strickland Brockington Lewis, LLP, Atlanta, GA, for Defendants.

### *ORDER*

TIMOTHY C. BATTEN, SR., District Judge.

This case is before the Court on Plaintiffs' motion for preliminary injunction [263]. For the reasons explained herein, the motion will be granted.

## I. Background

The parties and the Court are intimately familiar with the background and history of this case, but the Court will provide a brief synopsis.[1] Fayette County is located in Northwest Georgia. According to the 2010 decennial census, it has a population of 106,567 and a voting age population of 78,468. Out of this population, 57,766 (73.6%) of voters identify as White, and 15,247 (19.5%) of voters identify as Black.[2] The Black population in Fayette County is concentrated in the northern half of the county.

On August 9, 2011, Plaintiffs[3] filed a complaint against Defendants, alleging violations of § 2 of the Voting Rights Act, 52 U.S.C. § 10301.[4] In their complaint, Plaintiffs claim that Fayette County's at large method of electing members to the Fayette County board of commissioners and board of education effectively guaran-

---

1. For more detail on the background of the case, see *Georgia State Conference of NAACP v. Fayette County Board of Commissioners*, 775 F.3d 1336, 1340–41 (11th Cir.2015).

2. At various points in this litigation, the courts and the parties have used the terms "Black" and "African–American" interchangeably. Because Plaintiffs primarily used the term "Black" in their motion, the Court will use this term throughout the Order but notes that it is synonymous with refer-

ences to "African–American" in the Court's prior orders and the Eleventh Circuit's opinion.

3. Plaintiffs include the Georgia State Conference of the NAACP, the Fayette County Branch of the NAACP, and several Black registered voters residing in Fayette County.

4. This provision was previously codified at 42 U.S.C. § 1973.

tees that no Black candidate can be elected to either board, thereby depriving Black voters in Fayette County of the opportunity to elect candidates of their choice to the boards.

On February 20, 2012, Plaintiffs and the BOE [5] moved for entry of a proposed consent decree. The BOC objected to the consent decree. Plaintiffs and the BOE proposed an amended consent decree, and after briefing and a hearing regarding that consent decree, on May 30, the Court denied the motion to approve the amended consent decree. The Court also denied Plaintiffs' motion to file an interlocutory appeal of that ruling.

Following discovery, Plaintiffs and the BOC filed cross-motions for summary judgment. On May 21, 2013, the Court granted Plaintiffs' motion, finding that Plaintiffs had established a vote dilution claim in violation of § 2 of the Voting Rights Act. The Court also noted that the BOE had effectively conceded a § 2 violation in the proposed consent decree between Plaintiffs and the BOE. The Court ordered the parties to submit proposed remedial plans.

On February 18, 2014, after considering the remedial plans proposed by the parties and after a hearing and briefing by the parties, the Court adopted a remedial plan (the "Remedial Plan") developed with the assistance of Gina Wright, a Court-appointed expert or technical advisor. The Remedial Plan provides for district-based voting for five districts, including a majority-minority district. On March 13, the Court entered final judgment.

On March 19, 2014, Defendants filed appeals with the Eleventh Circuit. While their appeals were pending, Fayette County held its 2014 elections for the board of education and the board of commissioners using the Remedial Plan. A primary election was held in May 2014, a primary runoff election in July 2014, and a general election in November 2014. The result was that two members of the board of commissioners and two members of the board of education were elected using district-based voting under the Remedial Plan. Through this election, Pota Coston, a Black Democrat, became the first Black candidate to be elected to the board of commissioners, and she was elected to district 5, the single majority-minority district drawn under the plan. Leonard Pressberg, a White Democrat, was elected to the board of education for district 5.

On January 7, 2015, the Eleventh Circuit issued an opinion holding that the Court erred in rendering its § 2 determination on summary judgment because it "did so (1) without notice to one party, and (2) by weighing the evidence and making credibility determinations as to the other, both of which are inappropriate on summary judgment." *Ga. State Conf. of NAACP*, 775 F.3d at 1344. The court vacated and remanded this Court's entry of summary judgment against Defendants so that this Court could conduct a bench trial.

On February 5, 2015, the Court issued a notice setting this case for trial beginning on March 23. On February 10, Plaintiffs filed a consent motion to continue the trial date and requested leave to submit an amended joint proposed scheduling order. On March 17, at the parties' request, the Court entered an amended scheduling order, which allowed the parties to file a motion requesting the identification of any

---

**5.** The Court refers to the Fayette County Board of Education and its individual members in their official capacities as the "BOE." The Court refers to the Fayette County Board of Commissioners and its individual members in their official capacities, the Fayette County Board of Elections and Voter Registration, and Tom Sawyer in his official capacity as the "BOC."

additional experts and/or supplementing their existing expert reports.

Defendants subsequently filed three discovery-related motions. First, Defendants moved to depose Ms. Wright, the Court's appointed advisor who developed the Remedial Plan. The Court granted that motion on May 15, and Defendants deposed Ms. Wright on June 19. Defendants also moved to identify two new experts: Dr. Karen L. Owen and Linda Meggers. Defendants indicated that Dr. Owen would testify regarding the role of partisanship, as opposed to race, in determining the outcome of elections in Fayette County. Ms. Meggers, who has extensive experience in redistricting in Georgia, would testify regarding, among other things, traditional redistricting factors relied upon in Georgia, such as the use of intact precincts in re districting, local redistricting considerations in Fayette County, the role of race in re districting, and the level of compactness of the minority population in Fayette County. After careful consideration, on July 7, the Court granted each of Defendants' motions. Since then, the parties have been working to complete this additional discovery and prepare for a bench trial.

That brings us to the unfortunate circumstances underlying Plaintiffs' pending motion. On July 3, 2015, Ms. Coston, the first Black candidate elected to the board of commissioners in Fayette County, passed away following a battle with cancer. In the wake of this loss, the county began the process of preparing for a special election to replace Ms. Coston. Because the Eleventh Circuit had vacated the Court's summary judgment order, which served as the basis for developing and implementing the Remedial Plan, the county concluded that the special election should be held using the map and at-large voting method that were in place prior to the present litigation.

The county promptly set a schedule for the special election to comply with local and state law. Candidate qualifying is to take place from August 10 to August 14. August 17 is the deadline for registering to vote in the election. Advance voting will take place from August 24 to September 11. The election will be held on September 15, and any runoff election will be held on October 13.

On July 17, Plaintiffs filed their motion for preliminary injunction. In that motion, Plaintiffs ask the Court to (1) enjoin the BOC from qualifying candidates and conducting a special election, and any runoff, for Post 5 under at-large voting, and (2) order the BOC to instead qualify candidates and conduct the special election, and any runoff, in a manner consistent with the Court's February 2014 orders adopting the Remedial Plan and providing for election procedures under that plan. Mindful of the urgency of this matter, and to avoid disruption of the county's schedule, the Court requested expedited responses from Defendants and held an expedited hearing on Plaintiffs' motion on July 30.

The Court notes at the outset that it has faced many difficult decisions in this case, and this is certainly among them. However, after carefully considering the arguments of the parties, the evidence presented on the record to date, and the context of the present motion, the Court has determined that Plaintiffs' motion for a preliminary injunction should be granted. The Court has endeavored to explain the basis of this decision below with as much clarity and detail as possible but keeping in mind the pressing nature of the circumstances and the need to inform the parties of the Court's decision as soon as practicable.

## II. Discussion

 Although the nature of this case and its procedural history make it some-

what unique, the showing that Plaintiffs must make to obtain relief is not. To obtain a preliminary injunction, the moving party must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox,* 408 F.3d 1349, 1354 (11th Cir.2005) (quoting *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir.2000)). The Court will address each of these factors in turn and will then briefly discuss a few other general considerations raised by the parties.

### A. Likelihood of Success on the Merits [6]

Section 2 of the Voting Rights Act, as amended, provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of § 2 is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [52 U.S.C. § 10301(a)] in that its members have less opportunity than other members

of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

To prove a claim of vote dilution claim under § 2, Plaintiffs must establish three preconditions set forth in *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986): "(1) that the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district;' (2) that the minority group is 'politically cohesive;' and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate." *Solomon v. Liberty Cty. Comm'rs,* 221 F.3d 1218, 1225 (11th Cir.2000) (quoting *Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752). Once Plaintiffs have established these preconditions, the Court must then consider "whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" *Abrams v. Johnson,* 521 U.S. 74, 91, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (quoting § 2 of the Voting Rights Act).

In reviewing the totality of the circumstances, courts typically consider the factors set forth in the Senate Judiciary Report accompanying the 1982 amendments to § 2, which are often referred to as the "Senate factors." *See Gingles,* 478 U.S. at 44–45, 106 S.Ct. 2752.[7] However, these factors are "neither comprehensive nor exclusive." *Id.* As the Eleventh Circuit has recognized, "[t]he findings made within the framework of the three *Gingles* preconditions, and the nine nonexhaustive 'Senate factors,' will be more or less probative

---

6. In light of the Eleventh Circuit's opinion, the Court approaches the task of determining the likelihood of success before final adjudication at trial with some degree of trepidation. Nevertheless, the Court must do its duty, and this requires the Court to weigh the record

evidence to determine the likelihood of success.

7. These factors are set forth in the Court's summary judgment order. *See* [152] at 5–6.

depending upon the facts · of the case." *Solomon,* 221 F.3d at 1227.

■ Plaintiffs contend that they have demonstrated a likelihood of success on the merits in that they have demonstrated the existence of each of the three *Gingles* preconditions, and the totality of the circumstances indicates that Black voters in Fayette County have been denied an equal opportunity to elect the candidates of their choice. In doing so, Plaintiffs understandably rely heavily on the evidence submitted to the Court at summary judgment and note that at the summary judgment stage, the Court found that Plaintiffs had shown not just a likelihood of success but had actually proven their claims. As Defendants point out, the Court's summary judgment ruling has been vacated, and the parties will start with a clean slate when this case goes to trial. However, for the present purposes, it is apparent to the Court that Plaintiffs have shown a substantial likelihood of success on the merits by virtue of the fact that the Court granted summary judgment in their favor. While the court of appeals reversed that decision, the grounds for reversal were purely procedural, and the court took no issue with this Court's findings or analysis. *See Ga. State Conf. of NAACP,* 775 F.3d at 1343–44 ("[W]e cannot say that the district court misconstrued our precedent or reached its conclusion based on a misunderstanding of the applicable law.").

Aside from the deposition of Ms. Wright and the addition of Defendants' two experts, the record remains essentially the same as when the Court considered the parties' summary judgment motions. 'And because the Eleventh Circuit offered no substantive criticism of the Court's prior decision, and at least in *dicta* agreed with the legal framework used by the Court at summary judgment, the Court will rely heavily on its detailed summary judgment order in explaining its decision and will not re-visit issues that were addressed in that order unless the parties have provided arguments or evidence to warrant it.

As indicated below, Defendants primarily argue that Plaintiffs' claims must fail for two reasons: (1) it is not possible to create a majority-minority district in Fayette County that is constitutionally acceptable, and (2) racial bloc voting and the lack of electoral success among Black candidates in Fayette County is attributable to partisanship, not race.

The Court now turns to the three *Gingles* preconditions.

### 1. Gingles Preconditions

To show that the group of Black voters in Fayette County is "sufficiently large and geographically compact to constitute a majority in a single-member district," *Gingles,* 478 U.S. 30, 50, 106 S.Ct. 2752, at summary judgment Plaintiffs produced a plan, referred to as the "Illustrative Plan," which includes a majority-minority district with 50.22% of the voting-age population identifying as "any part black." [8]

---

8. Defendants challenge the use of the "any part black" census category to create a majority-minority district, contending that Plaintiffs have failed to show that different minority groups vote cohesively in · Fayette County. But the cases Defendants cite in support of this concern coalition claims, where plaintiffs allege that more than one minority group votes as a bloc. Here, Plaintiffs are not attempting to establish that all minorities in Fayette County vote as a bloc; rather, they are simply saying that people who identify as

both Black and some other race should still be included within the definition of "Black." Neither party has pointed to case law definitively requiring the use of one category or the other in the § 2 context, but Plaintiffs have pointed out that in *Georgia v. Ashcroft,* 539 U.S. 461, 474 n. 1, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003), the Supreme Court indicated that for purposes of determining retrogression under § 5, when a "case involves an examination of only one minority group's ef-

Plaintiffs' expert, William Cooper, conducted an analysis under the Reock test to demonstrate the sufficient compactness of the Illustrative Plan, and he testified that in addition to race, he considered other race-neutral redistricting principles such as incumbency and community groups of interest in developing this plan. At the summary judgment stage, the Court considered Defendants' arguments that the minority community is not sufficiently compact and that any minority-majority district in Fayette County would run afoul of the Equal Protection Clause, but the Court concluded that Plaintiffs had demonstrated through the Illustrative Plan that the first *Gingles* precondition was satisfied.

Since that time, Defendants have named a new expert, Ms. Meggers, who has extensive experience in redistricting in Georgia, including in Fayette County. Defendants rely heavily on Ms. Meggers's declaration in support of their contention that Plaintiffs cannot establish the presence of the first *Gingles* factor. In her expert affidavit, Ms. Meggers states that "[i]n Fayette County, one cannot achieve a 50% minority voting age district without disregarding traditional districting criteria and race-neutral population equality." [238–2] at ¶ 68. In her analysis, Ms. Meggers examines both the Illustrative Plan and the Remedial Plan. Among other things, Ms. Meggers contends that the population deviation among districts in both plans is too great; the plans imper-missibly split precincts; and the plans use land bridges with little or no population to connect census blocks with higher concentrations of Black voters. In response to Ms. Meggers, Plaintiffs have provided a supplemental declaration by Mr. Cooper disagreeing with Ms. Meggers's conclusions, arguing that the "land bridges" identified by Ms. Meggers bear no resemblance to the ones courts took issue with in Georgia redistricting litigation in the 1990s, and also offering a "zero deviation plan" with minimal population deviation that purportedly cures some of the concerns raised by Ms. Meggers.

Ms. Meggers's basic contentions are not new. They are similar to the arguments the BOC and John Morgan, its expert, raised at summary judgment, which the Court ultimately found unpersuasive. But even if the Court were to agree based on Ms. Meggers's experience that the developers of the Illustrative Plan and the Remedial Plan "did not give customary weight to traditional districting criteria" in developing these plans, [238–2] at 40, this does not necessarily mean, as Defendants' contend, that Plaintiffs' claims must fail.

Defendants' basic contention is that Plaintiffs cannot establish the first *Gingles* precondition because it is not possible to draw a majority-minority district that is constitutional in that any such district would necessarily be underpopulated and would need to be drawn by subordinating traditional redistricting principles to race.

---

fective exercise of the electoral franchise .... it is proper to look at all individuals who identify themselves as black." Plaintiffs have met their challenge of proving the second and third *Gingles* factors, and at this time, the Court is not willing to exclude Black voters who also identify with another race when there is no evidence that these voters do not form part of the politically cohesive group of Black voters in Fayette County. Similarly, in the absence of factual data, the Court will not, as Defendants suggest, assume that Black in-dividuals who also identify as Hispanic are not citizens. *See Nipper v. Smith*, 39 F.3d 1494, 1525–26 (11th Cir.1994) (recognizing that "plaintiffs to make out a case of vote dilution are not required to prove the negative"). That said, the Court would be willing to evaluate both of these contentions at trial if there is any evidence to support them, and indeed the Court would expect the parties to address these contentions now that Defendants have raised them.

As the Court has indicated, although they are related, the inquiry under the first prong of *Gingles* and the determination of whether a districting plan resulted from an unconstitutional racial gerrymandering are distinct issues. *See* [152] at 25–29; *see also Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir.1998) ("[T]he *Miller* and *Gingles/Nipper/SCLC* [*Southern Christian Leadership Conf. v. Sessions*, 56 F.3d 1281 (11th Cir.1995) ] lines address very different contexts.").

But even if the inquiries were identical, the Court is not persuaded by Defendants' arguments at this juncture. The Court has previously concluded that in drawing the Illustrative Plan, Mr. Cooper "took race into consideration" but "did not do so at the expense of other redistricting principles," [152], at 42, and that the Remedial Plan was also drawn without using race as "the predominant factor." *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). In its order adopting the Remedial Plan, the Court specifically discussed the factors that were considered in drawing the plan and expressly concluded that race was not the dominant and controlling consideration in creating the plan. *See* [179].

Defendants cite to recent testimony from Gina Wright indicating that race was a priority consideration in drawing the plan. But the Court has acknowledged that "race was *a* factor in creating the remedial plan." [179] at 17. The intentional creation of a majority-minority district necessarily requires consideration of race. This does not necessarily mean that it was the "predominant, overriding" consider-

ation. *Miller,* 515 U.S. at 920, 115 S.Ct. 2475.

But more importantly, even if the Court were to conclude based on the testimony of Ms. Meggers and Ms. Wright that race was the predominant consideration in drawing the Illustrative Plan and the Remedial Plan, that would not automatically render the plans unconstitutional. Instead, it would subject them to strict scrutiny. *See id.* (indicating that where race was "the predominant, overriding factor explaining" a redistricting plan, to uphold the plan, "the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest"). Defendants' arguments and evidence to date seek to establish that the plans were drawn with race as the predominant consideration, but they do not address the issue of whether, assuming this is true, that use of race was narrowly tailored to achieve a compelling government interest. Indeed, with respect to both the Illustrative Plan and the Remedial Plan, the Court previously concluded that even if the plans were subject to strict scrutiny, they would pass constitutional muster, *see, e.g.,* [179] at 20. That is not to say that the Court could not determine otherwise at trial, but based on the present record, the Court believes Plaintiffs have shown a substantial likelihood of success in establishing the first *Gingles* factor.[9]

Plaintiffs have also provided expert testimony analyzing prior elections to establish the second and third *Gingles* factors. Aside from a passing remark that the election results Plaintiffs' expert analyzed are now stale, as at summary judgment, De-

---

**9.** Regarding Defendants' legal contentions that the population deviations in the Illustrative Plan and the Remedial Plan are unconstitutional, the Court has previously concluded that the plans satisfied the one person, one vote requirement. *See* [152] at 40–41; [179] at 24–25. Further, even if the Court were to

reconsider this determination, in response to Defendants' contentions, Plaintiffs have provided a new "zero deviation" plan to show that it is possible to draw a majority-minority district with very minimal population deviation.

fendants do not directly challenge Plaintiffs' expert testimony establishing the second and third *Gingles* factors. Instead, they contend that what appears to be racial bloc voting is actually nothing more than partisanship at work. *See Solomon,* 221 F.3d at 1225 (indicating that proof of the three *Gingles* preconditions does not end the § 2 inquiry because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates"). This brings the Court to the final step of the analysis— whether under the "totality of the circumstances, minorities have been denied an equal opportunity to participate in the political process and to elect representatives of their choice." *Abrams,* 521 U.S. at 91, 117 S.Ct. 1925 (internal quotation marks omitted).

### 2. Totality of the Circumstances

The Court considered each of the Senate factors at length at summary judgment, and although Defendants quibble with the significance of some of the other factors, there is no doubt that the most important, and most contested, considerations given the evidence to date are racially polarized voting and the lack of electoral success by Black candidates in county-wide elections. It is undisputed that prior to Ms. Coston, no Black candidate had been elected to the board of commissioners in Fayette County, and indeed the only Black candidate elected county-wide appears to have been Magistrate Judge Charles Floyd, who was appointed and ran unopposed as an incumbent for several years. The Court does not view this as evidence that Black candidates can be elected to the board of commissioners or board of education in county-wide voting. Additionally, Defendants do not dispute that Black voters in Fayette County are politically cohesive. Dr. Owen stated that "[t]he large majority of Black voters in Fayette County have voted Democratic." [240–1], at ¶ 29. But Defendants assert that it is precisely this cohesion around partisan lines that accounts for their lack of electoral success.

At summary judgment, Defendants raised the possibility that racial bloc voting and the lack of electoral success for Black candidates was caused by partisanship as opposed to race. At the time, Defendants offered no evidence, only speculation, which the Court declined to consider. Now, Defendants have engaged an expert, Dr. Owen, who will testify that party, not race, explains election outcomes in Fayette County. Specifically, Dr. Owen examined the outcomes of the general elections in 2010, 2012, and 2014, and concluded that the results of these elections were driven by partisanship, not race. Among other things, Dr. Owen notes that Fayette County voters overwhelmingly vote Republican in both the primaries and the general election. She also notes that in the elections she examined, White Democrats faired no better than Black Democrats county-wide, and in the 2014 elections for the BOE and BOC, Ms. Coston, a Black Democrat elected to the BOC from District 5, received approximately the same percentage of votes as Mr. Pressburg, a White Democrat elected to the BOE from District 5.

But Plaintiffs contend that Dr. Owen's testimony fails to show that racial bloc voting and lack of electoral success among Black candidates are solely the result of partisanship for at least one important reason—none of the races Dr. Owen examined included a Black Republican. And as Plaintiffs point out, Black candidates have been unsuccessful in prior Republican primaries. Plaintiffs also assert that although she considered the race of the candidates, Dr. Owen did not consider the race of the voters. Defendants contend Dr. Owen did consider the race of the voters implicitly by making sure that vot-

ing patterns were consistent among precincts. Although this is helpful, the Court notes that this still does not indicate, for example, the percentage of Democratic voters who were Black or the percentage of Republican voters who were White in the elections Dr. Owen relies upon.

Ultimately, the Court recognizes that Defendants have raised an interesting possibility that partisanship, not race, accounts for the lack of electoral success in Fayette County. But on the current record, the Court is unable to conclude that this is the case. And in the absence of a persuasive correlation, the Court believes the evidence of racial bloc voting and the lack of electoral success of Black candidates before Ms. Coston, including a lack of success by Black candidates in Republican primaries, point "commandingly in [Plaintiffs'] favor." *Ga. State Conf. of NAACP,* 775 F.3d at 1347 n. 9. The Court now turns to the other factors for granting injunctive relief.

## B. Irreparable Injury

As Plaintiffs note, the Supreme Court has recognized that "the right of qualified voters ... to cast their votes effectively ... rank[s] among our most precious freedoms." *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Plaintiffs contend that they will suffer harm from at-large voting because it will dilute their votes in the upcoming election and effectively deny their right to vote. *See Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (noting that "the right of suffrage can be denied by [means of] dilution ... just as effectively as by wholly prohibiting the free exercise of the franchise"). And they contend that no amount of money can undo the harm caused by vote dilution. *See Scott v. Roberts,* 612 F.3d 1279, 1295 (11th Cir.2010) ("An injury is irreparable 'if it cannot be undone through monetary reme-

dies.'" (quoting *Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir.1987))).

Defendants contend that any harm to Plaintiffs can be remedied by calling a special election after the Court has finally adjudicated Plaintiffs' claims. The BOC cites *Miller v. Board of Commissioners of Miller County,* 45 F.Supp.2d 1369, 1372 (M.D.Ga.1998), in support of this contention, but in that case, the court denied the plaintiffs' request to enjoin upcoming elections, finding that they were not likely to suffer irreparable injury without the injunction because the court could "suspend the results of the primary elections and order special primary elections under a revised districting plan(s)." *Id.* Notably, the court in *Miller* limited the foregoing comment to *primary* elections, noting that "the upcoming elections are primary elections that will only partially influence which candidates ultimately succeed to local office." *Id.* The court in *Miller* also denied the injunction based on laches, in light of the plaintiffs' delay in requesting it. *Id.* at 1375.

Here, Plaintiffs did not delay in requesting injunctive relief. Upon learning that the upcoming special election would be held using at-large voting, they promptly filed their motion for a preliminary injunction. And the upcoming special elections are not primary elections to be followed by a general election; they will decide which candidate succeeds to office. Defendants are correct that the Court could call a subsequent special election after finding that the at-large voting method violates § 2, but this would not undo the harm to Plaintiffs during the period between the upcoming election and the subsequent special election. Therefore, the Court finds that Plaintiffs have established that they would be irreparably harmed in the absence of injunctive relief. *See Dillard v. Crenshaw County,* 640

F.Supp. 1347, 1363 (M.D.Ala.1986) ("Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance.").

### C. Balancing of the Harms or Equities

Defendants contend that they would be harmed in at least two distinct ways if the Court enters an injunction. First, Defendants argue that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King,* —— U.S. ——, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Rehnquist, J., in chambers)). Second, Defendants indicate that county officials have expended significant time and resources over the last few weeks to conduct the special elections using at-large voting, and these resources would essentially go to waste if the Court granted an injunction. With regard to the first argument, the situation in *King* was distinguishable from the present situation in several respects. It did not involve voting rights; instead, it concerned the stay of a judgment that would have enjoined a state law regarding collection of defendants' DNA prior to being convicted. In that case, Chief Justice Roberts noted that in addition to the general harm of enjoining a duly enacted state law, there was "ongoing and concrete harm to Maryland's law enforcement and public safety interests." *Id.* at 3. Here, there are no attendant public safety concerns, and further, Defendants' interest in using the at-large method of voting is diminished to the extent that it violates § 2.

Additionally, although the Court recognizes that an injunction would require ad-ditional efforts on the part of the BOC, the Court agrees with Plaintiffs that the harm they would suffer by way of vote dilution outweighs the harm to the BOC. The Court is not requiring the BOC to implement an entirely new plan; the BOC will be required to use the plan that was used in the last set of elections in 2014. Further, the BOC has not argued that it would be impossible or unduly burdensome to conduct the elections using the Remedial Plan. Instead, the BOC focuses on the fact that it has already expended resources to conduct the election at-large. But the Court cannot justify limiting Plaintiffs' right to vote because of the BOC's past expenditures.

The Court notes, however, that the BOC has persuasively argued that there would be serious irreparable harm to the public and the BOC if the Court enjoined the special elections altogether until entering final judgment in this case. As the BOC explains, the commission is made up of five members. At present, there are only four commissioners, which means that important matters can be held up in the event of a tied vote. The Court therefore recognizes the need to conduct a special election without delay and has endeavored to issue a decision as soon as possible to avoid delay in electing a new commissioner.

### D. Public Interest

The parties' arguments regarding the public interest substantially overlap with their contentions regarding irreparable harm and balancing of the equities. Plaintiffs highlight the need to protect the right to vote. Defendants highlight the interest in allowing the county to hold its elections in the chosen manner and the fact that more voters would have the opportunity to vote in an at-large election. Where, as here, Plaintiffs have established a substantial likelihood of success on the merits, the Court believes the public interest is best served by ensuring not simply that more

voters have a chance to vote but ensuring that all citizens of Fayette County have an equal opportunity to elect the representatives of their choice. *See Cox*, 408 F.3d at 1355 (concluding that the protection of "franchise-related rights is without question in the public interest").

The Court has also considered the BOC's argument that an injunction would create voter confusion. Unfortunately, under the present circumstances, the Court believes there is likely to be voter confusion either way. There is no indication that requiring the use of the Remedial Plan, the plan used to elect Ms. Coston, would cause more confusion than the BOC's current plan to revert back to at-large voting after holding the 2014 elections under the Remedial Plan. The BOC has indicated that there has been great public interest in the present situation, and the Court is confident that just as it did in 2014, the BOC can rise to the task of communicating to voters that the election will be held by district voting.

### E. Other Considerations

In addition to the four factors the Court considers when evaluating a request for injunctive relief, the parties raise a few other general issues that the Court will briefly address. First, Defendants argue that the Court should not issue the requested injunction because it would be a mandatory injunction, in the sense that it would affirmatively require the BOC to take action instead of preserving the status quo. *See Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored,

and should not be issued unless the facts and law clearly favor the moving party.").[10] Defendants assert that the "status quo" is the redistricting plan in place before the Court adopted the Remedial Plan because it "is the last uncontested status which preceded the pending controversy." *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1194 (5th Cir.1975) (citations and internal quotation marks omitted).[11]

Plaintiffs concede that as a result of the Eleventh Circuit's decision, the status quo is technically the at-large voting plan and procedures that were in place before the lawsuit was filed. But as the Fifth Circuit has recognized, there is no "particular magic in the phrase 'status quo.'" *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974) ("If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." (citations omitted)). If Ms. Coston had been elected under the at-large plan that existed prior to the litigation, the Court would likely find Defendants' arguments about preserving the status quo more persuasive. But the Remedial Plan was the last plan used during an election cycle, and Ms. Coston was elected under that plan. The Court finds this fact significant in evaluating the equities of granting the requested relief.

Finally, the parties cite a number of cases in which preliminary injunctions were either granted or denied in election law cases, including cases under § 2. Al-

---

**10.** The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *See*

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc).

**11.** *Boire* involved an injunction under the Taft–Hartley Act.

though it will not take the time to distinguish each and every one of these cases, the Court thinks it is fair to say that neither party has cited a case that is substantially similar to this case in terms of the facts and the procedural posture. In particular, the Court notes that this is not like cases in which the district court deferred creation of a remedy to the legislature or denied a request for mandatory injunctive relief because there was not time to develop a suitable plan. The Court would be much more reluctant to impose a remedial plan at this stage in the case if a plan had not already been developed and implemented.

The Court also recognizes that the cases cited by the parties caution that before granting or denying an injunction, courts should consider the special circumstances related to impending elections and the significance of the issues at stake. For example, in *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court recognized the need to take appropriate action to ensure that future elections do not violate the statutory or constitutional rights of voters, but the Court also stated that "[i]n awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." Similarly, in considering a motion to enjoin voter ID laws in Arizona, the Supreme Court indicated that the court of appeals "was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases." *Purcell v. Gonzalez,* 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). The Court noted that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4–5, 127 S.Ct. 5.

Here, the Court has considered the interests at stake as well as other factors unique to this case, including the timing of the election, the fact that the Remedial Plan was used in the most recent set of elections in 2014, the fact that district-based voting should lessen, rather than increase, the number of volunteers needed by the county, and the fact that Ms. Coston was elected under the Remedial Plan. In the context of this case, the Court has determined that an injunction is appropriate.

Having determined that the injunction should issue, the Court cautions that this is not a permanent injunction, and it should not be viewed by the parties as an indication that the Court will necessarily rule in favor of Plaintiffs at trial.[12] As with most preliminary injunctions, the parties are still developing the record in this case, and Defendants have raised some issues that

---

**12.** Defendants have suggested that because of the complexity of the issues at stake, the Court cannot enter an injunction without conducting a trial or full-blown evidentiary hearing. But Defendants never formally requested an evidentiary hearing, and in any event this case is not like the cases cited by Defendants, where the Eleventh Circuit concluded that under the facts of the case, short notice with only a brief opportunity to present arguments in opposition to the motion deprived defendants "of a fair and meaningful opportunity to oppose [plaintiffs'] motion." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp.,* *Inc.,* 887 F.2d 1535, 1538 (11th Cir.1989); *see also Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1212 (11th Cir.2003) (concluding that the district court "deprived the Appellants of any meaningful opportunity to adequately present their evidence rebutting the Appellees' assertions" and "effectively issued and upheld the injunction based on evidence presented by only one party"). Here, the Court has an extensive record, developed through months of discovery and subsequent motions, including Defendants' recent motions regarding additional discovery. The Court can hardly say Defen-

could ultimately persuade the Court to decide in their favor at trial even though the Court was not convinced by them for purposes of this motion.

## III. Conclusion

Recognizing the parties' interests and the public interest in avoiding voter confusion, the Court does not take this decision lightly. But a decision must be made, and it must be made promptly. For the foregoing reasons, the Court grants Plaintiffs' motion for preliminary injunction [263],[13] The BOC is hereby enjoined from qualifying candidates and conducting the special election and any special runoff for county commissioner post 5 under at-large voting, and the BOC is hereby ordered to qualify candidates and conduct such special election, and any related runoff, using the Remedial Plan adopted by this Court on February 18, 2014, and in a manner consistent with this Court's orders of February 18, 2014[179] and February 21, 2014[181].

dants have been deprived of an opportunity to present their opposition.

13. Plaintiffs' motion for leave to file excess pages in their reply brief [268] is also granted.